# In the United States District Court
# In and For the Southern District of Florida

Case No.: _____

**PATRICIA HANNAH**,

as plenary legal guardian of Darryl Vaughn Hanna, Jr., an individual,

*Plaintiff*,

-vs-

**ARMOR CORRECTIONAL HEALTH SERVICES, INC.**,

a Florida For-Profit Corporation,

**LEILA POLANCO**,

Individually and as an employee of Armor Correctional Health Services, Inc.,

**CARMA OGLINE**,

Individually and as an employee of Armor Correctional Health Services, Inc.,

**BERNARD MONTAYRE**,

Individually and as an employee of Armor Correctional Health Services, Inc.,

**PAULA SANDERS**,

Individually and as an employee of Armor Correctional Health Services, Inc.,

**ROSE MARIE GRETHER**,

Individually and as an employee of Armor Correctional Health Services, Inc.

**DAVID CHARLES GRETHER, JR.**,

Individually and as an employee of Armor Correctional Health Services, Inc.

**ELVIRA PEREZ**,

Individually and as an employee of Armor Correctional Health Services, Inc.,

**RICK WELLS**,

in his official capacity as Sheriff of the Manatee County Sheriff's Office,

**RONALD LAUGHLIN**,

Individually and as an employee or agent of Manatee County Sheriff's Office,

**BOARD OF COUNTY COMMISSIONERS – MANATEE COUNTY, FL**,

in its official capacity acting on behalf of a political subdivision of Florida,

*Defendants*.

## Complaint for Money Damages and Demand for Trial by Jury

## TABLE OF CONTENTS

JURISDICTION AND VENUE ...................................................................................3

PARTIES....................................................................................................................4

FACTUAL ALLEGATIONS........................................................................................6

First Syncopal Incident ..........................................................................7
Second Syncopal Episode........................................................................9
Third Syncopal Episode.........................................................................11
Armor's Policies......................................................................................12
The Health Services Agreement Between Armor, County, and MCSO......................22
Other Armor Incidents ...........................................................................28

COUNT I – NEGLIGENT HIRING OF NURSE POLANCO...................................31

*(As to Defendant, Armor Correctional Health Services, Inc., only)* .....................31

COUNT II – NEGLIGENT SUPERVISION .............................................................33

*(As to Defendant, Armor Correctional Health Services, Inc., only)* .....................33

COUNT IV - DELIBERATE INDIFFERENCE REGARDING HANNA'S SERIOUS MEDICAL NEEDS FOR AMBULATORY, EMERGENCY, SPECIALTY, AND OUTSIDE SERVICES .............................................................................................37

*(As to Defendant, Armor Correctional Health Services, Inc., only)* .....................37

COUNT V – VICARIOUS LIABILITY FOR EMPLOYEES' MEDICAL NEGLIGENCE ................................................................................................................................42

*(As to Defendant, Armor Correctional Health Services, Inc., only)* .....................42

COUNT VI – NEGLIGENT SUPERVISION AND RETENTION OF ARMOR .................44

*(As to Defendant, Sheriff Rick Wells, in his official capacity only)* ......................44

COUNT VII – NEGLIGENT RETENTION OF MCSO EMPLOYEES.............................51

*(As to Defendant, Sheriff Rick Wells, in his official capacity only)* ......................51

COUNT VIII – DELIBERATE INDIFFERENCE ....................................................55

*(As to Defendant, Sheriff Rick Wells, in his official capacity only)* ......................55

COUNT IX – NEGLIGENT RETENTION AND SUPERVISION OF ARMOR .................61

*(As to Defendant, Board of County Commissions – Manatee County, Florida only)* ...........61

COUNT X – DELIBERATE INDIFFERENCE ........................................................68

*(As to Defendant, Board of County Commissions – Manatee County, Florida only)* ...........68

COUNT XI – MEDICAL NEGLIGENCE .................................................................74

*(As to Defendant, Nurse Leila Polanco, only)*........................................................74

**COUNT XII – DELIBERATE INDIFFERENCE** ................................................................**75**

*(As to Defendant, Nurse Leila Polanco, only)* ................................................ *75*

**COUNT XIII – MEDICAL NEGLIGENCE** ................................................................**81**

*(As to Defendant, Nurse Carma Ogline, only)* ................................................ *81*

**COUNT XIV – DELIBERATE INDIFFERENCE** ................................................................**82**

*(As to Defendant, Nurse Carma Ogline, only)* ................................................ *82*

**COUNT XV – MEDICAL NEGLIGENCE** ................................................................**89**

*(As to Defendant, Nurse Bernard Montayre, only)* ........................................ *89*

**COUNT XVI – DELIBERATE INDIFFERENCE** ................................................................**90**

*(As to Defendant, Nurse Bernard Montayre, only)* ........................................ *90*

**COUNT XVII – MEDICAL NEGLIGENCE** ................................................................**96**

*(As to Defendant, Nurse Paula Sanders, only)* ................................................ *96*

**COUNT XVIII – DELIBERATE INDIFFERENCE** ................................................................**98**

*(As to Defendant, Nurse Paula Sanders, only)* ................................................ *98*

**COUNT XIX – DELIBERATE INDIFFERENCE** ................................................................**104**

*(As to Defendant, Nurse Rose Marie Grether, only)* ...................................... *104*

**COUNT XX – DELIBERATE INDIFFERENCE** ................................................................**111**

*(As to Defendant, Nurse David Charles Grether, only)* .................................. *111*

**COUNT XXI – DELIBERATE INDIFFERENCE** ................................................................**117**

*(As to Defendant, Doctor Elvira Perez, only)* ................................................ *117*

**COUNT XXII – NEGLIGENCE** ................................................................**124**

*(As to Defendant, Sgt. Ronald Laughlin, only)* .............................................. *124*

**COUNT XXIII – DELIBERATE INDIFFERENCE** ................................................................**125**

*(As to Defendant, Sgt. Ronald Laughlin, only)* .............................................. *125*

**COUNT XXIV – DELIBERATE INDIFFERENCE TO KEEP HANNA IN JAIL** ...........**127**

*(As to Defendant, Armor Correctional Health Services, Inc., only)* ................ *127*

COMES NOW, the Plaintiff, PATRICIA HANNAH, as plenary guardian for Darryl Vaughn Hanna, Jr., by and through undersigned counsel, and files this lawsuit against ARMOR CORRECTIONAL HEALTH SERVICES, INC., a Florida For-Profit Corporation; LEILA POLANCO, CARMA OGLINE, BERNARD MONTAYRE, PAULA SANDERS, ELVIRA PEREZ, DAVID CHARLES GRETHER, JR., and ROSE MARIE GRETHER, individually and as employees of Armor Correctional Health Services, Inc.; RICK WELLS, in his official capacity as Sheriff of the Manatee County Sheriff's Office; RONALD LAUGHLIN, individually and as an employee or agent of the Manatee County Sheriff's Office; and the BOARD OF COUNTY COMMISSIONERS – MANATEE COUNTY, FLORIDA, in its official capacity acting on behalf of a political subdivision of Florida, and states:

## JURISDICTION AND VENUE

1.      This is a civil action seeking damages in excess of $15,000.00 USD, exclusive of costs, interest, and attorneys' fees.

2.      Plaintiff has fully complied with all conditions precedent prior to bringing this action, including, but not limited to, Section 768.28 and Chapter 766, Florida Statutes.

3.      The predominant counts in this action arise under the Constitution and laws of the United States of America and thus invoke this Court's original jurisdiction over federal questions pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

4.      The remaining counts in this action arise under the common law or laws of the State of Florida and are so related to those claims for which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution and thus invoke this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1332.

5.      Venue is proper. 28 U.S.C. § 1367. Defendant, Armor Correctional Health Services, Inc.'s, principal address is in Miami, Florida, and all defendants are residents of Florida.

6.     The Plaintiff, PATRICIA HANNAH, is plenary legal guardian of Darryl Vaughn Hanna, Jr. ("HANNA").[1]  She is a resident of Broward County, Florida, *sui juris*, and for the sake of clarity will heretofore be referred to only as "PLAINTIFF."

7.     The Defendant, ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("ARMOR"), is a Florida For-Profit corporation with a principal address of 4960 SW 72nd Avenue, Suite 400, Miami, FL 33155.  During all times material, ARMOR was contracted to provide health services to people detained and/or incarcerated within the correctional facility located at or near 14470 Harlee Road Palmetto, Florida 34221 ("Manatee County Jail").

8.     The Defendant, LEILA POLANCO ("NURSE POLANCO"), an individual who is *sui juris*, was, at all times material, a nurse employed by ARMOR and worked at the Manatee County Jail.  Based on information and belief, NURSE POLANCO is a resident of Bradenton, Manatee County, Florida.

9.     The Defendant, CARMA OGLINE ("NURSE OGLINE"), an individual who is *sui juris*, was, at all times material, a nurse employed by ARMOR and worked at the Manatee County Jail.  Based on information and belief, NURSE OGLINE is a resident of Palmetto, Manatee County, Florida.

10.     The Defendant, BERNARD MONTAYRE ("NURSE MONTAYRE"), an individual who is *sui juris*, was, at all times material, a nurse employed by ARMOR and worked at the Manatee County Jail.  Based on information and belief, NURSE MONTAYRE is a resident of Tampa, Hillsborough County, Florida.

11.     The Defendant, PAULA SANDERS ("NURSE SANDERS"), an individual who is *sui juris*, was, at all times material, a nurse employed by ARMOR and worked at the Manatee

---

[1]     The correct spelling of Patricia Hannah's last name includes an "h" as its final letter, but the correct spelling of Darryl Vaughn Hanna, Jr.'s last name does not.

County Jail. Based on information and belief, NURSE SANDERS is a resident of Bradenton, Manatee County, Florida.

12.     The Defendant, ROSE MARIE GRETHER ("NURSE M. GRETHER"), an individual who is *sui juris*, was, at all times material, a nurse employed by ARMOR and worked at the Manatee County Jail. Based on information and belief, NURSE M. GRETHER is a resident of Sarasota, Sarasota County, Florida.

13.     The Defendant, DAVID CHARLES GRETHER, JR. ("NURSE D. GRETHER"), an individual who is *sui juris*, was, at all times material, a nurse employed by ARMOR and worked at the Manatee County Jail. Based on information and belief, NURSE D. GRETHER is a resident of Sarasota, Sarasota County, Florida.

14.     The Defendant, ELVIRA PEREZ ("DOCTOR PEREZ"), an individual who is *sui juris*, was, at all times material, a medical doctor employed by ARMOR and worked at the Manatee County Jail. Based on information and belief, DOCTOR PEREZ is a resident of St. Petersburg, Pinellas County, Florida.

15.     The Defendant, RICK WELLS ("SHERIFF WELLS"), an individual who is *sui juris*, is a constitutional officer and the Sheriff of the Manatee County Sheriff's Office ("MCSO").

16.     The Defendant, RONALD LAUGHLIN ("SGT. LAUGHLIN"), an individual who is *sui juris*, was, at all times material, an employee or agent of the MCSO and worked at the Manatee County Jail.

17.     The Defendant, BOARD OF COUNTY COMMISSIONERS – MANATEE COUNTY, FLORIDA ("COUNTY"), establishes policies to protect the health, welfare, safety, and quality of life in Manatee County, Florida, a political subdivision of the State of Florida.

**FACTUAL ALLEGATIONS**

18.     The Manatee County Jail is a correctional facility intended to *inter alia* detain people who are accused of violating criminal laws of the State of Florida within the jurisdiction of Manatee County, Florida.

19.     On or about August 9, 2017, HANNA was arrested by agents of the MCSO on suspicion that he violated criminal laws of the State of Florida within Manatee County, Florida.

20.     Following his arrest, HANNA was brought to the Manatee County Jail as a pretrial detainee.

21.     On or about August 10, 2017, during HANNA's initial classification, in response to the prompt, "Do you have any mental, physical, or developmental disabilities or limitations that we need to know about during your incarceration?," Deputy Vega of MCSO indicated "No."

22.     On or about August 10, 2017, HANNA expressed a desire to work for MCSO for free (i.e. he did not ask for any compensation, monetary or otherwise) and enroll in the Road Gang.

23.     On or about August 10, 2017, at or near 12:00 p.m., HANNA received inmate worker medical clearance for inmate worker status, outside work, and kitchen/food handling by Nurse Sonya Soucy.

24.     Between the time of his booking at the Manatee County Jail through August 22, 2017, HANNA presented and appeared to be a well-nourished, healthy 29-year old black male.

25.     On HANNA's Intake Health Screening, his appearance was noted as unremarkable; he did not have any visible signs of serious injury; his behavior was acceptable; he was alert and oriented; his ease of movement was unremarkable; his breathing was comfortable; and had no disabilities.

26.     HANNA's height was listed as 5'6"; his weight at 192lbs; his blood pressure at 143/89; his pulse at 68; and his temperature at 98.7 degrees Fahrenheit.

27.    HANNA did not indicate that he was currently ill or injured; that he had a head injury or loss of consciousness in the last 72 hours; or that he had been to a hospital or ER within the past 3 months.

28.    HANNA did indicate that he had currently active asthma and had last used his inhaler the year before, in 2016.

29.    Nurse Roxanne Joseph, an ARMOR employee at the time, concluded that HANNA presented with no significant condition(s) and instructed him to access health services as needed.

### First Syncopal Incident

30.    On or about August 23, 2017, at approximately 11:58 a.m., Deputy Thomas McGuire of MCSO was assigned to H&S Pod in the Manatee County Jail when he received a phone call from a female colleague working as H&S Control Room Operator informing him that an inmate had informed her via intercom that HANNA had passed out on the H/SW exercise yard.

31.    After receiving that call, Deputy McGuire responded to the exercise yard and saw HANNA waiting at the door.  Deputy McGuire brought HANNA into the core area and began inquiring as to what had happened.

32.    HANNA said he was playing basketball, blacked out, and that his head still hurt.

33.    According to Deputy McGuire, HANNA appeared disoriented at that time.

34.    Medical staff was called via radio to respond to H&S and NURSE POLANCO arrived shortly thereafter.

35.    When NURSE POLANCO arrived, HANNA was seated in a chair.

36.    NURSE POLANCO heard other residents of the Manatee County Jail saying that HANNA had a seizure, it was too hot outside, HANNA was playing basketball too hard, and/or that another resident hit HANNA in the head.

37.    NURSE POLANCO took HANNA's vital signs, including blood pressure, pulse,

and looked at his eyes.  HANNA's pulse was 90 and his blood pressure was 98/80.

38.     HANNA was conscious and able to verbally communicate at that time.

39.     HANNA told NURSE POLANCO *inter alia* that he had a right-sided headache.

40.     NURSE POLANCO asked HANNA his pain level on a scale of 1-to-10 and HANNA told her he felt at a 7 at that time.

41.     NURSE POLANCO contemplated whether HANNA fainted due to the warm temperature outside and had a syncope episode.

42.     NURSE POLANCO thought HANNA might have hit his head during the fall and it was possible that he sustained a concussion.

43.     Ultimately, on the Urgent Care Assessment form NURSE POLANCO completed about this incident, which has a date of "8/22/17" even though the incident occurred on August 23, 2017, NURSE POLANCO did not select the checkbox under "Type of Urgent Situation" associated with "Acute Medical Condition (e.g. loss of consciousness, seizure, etc.); instead, she selected the subcategory beneath "Injury" of "Unintentional (e.g. sports, fall, etc.)."

44.     NURSE POLANCO asked to see any available video surveillance that recorded HANNA's incident in the exercise yard to see exactly what happened to him.

45.     SGT. LAUGHLIN was notified by Deputy McGuire of the situation and NURSE POLANCO's request to view any available video.

46.     NURSE POLANCO was then permitted to view a color video recording of the incident on a computer.  There was no audio.

47.     That video showed HANNA and other residents playing basketball outside in the exercise yard when, all of a sudden, HANNA fell and hit his head.

48.     In SGT. LAUGHLIN's review of that same video, he noted that at 11:55:19 on August 23, 2017, HANNA collapsed in the exercise yard and was on the ground until 11:56:00—

a duration of 41 seconds.

49.     At no point on August 23, 2017 did NURSE POLANCO or SGT. LAUGHLIN contact or request fire rescue or any other form of non-ARMOR emergency medical services respond to the Manatee County Jail to evaluate HANNA.

50.     At no point on August 23, 2017 did NURSE POLANCO or SGT. LAUGHLIN recommend to anyone that fire rescue or any other form of non-ARMOR emergency medical services respond to the Manatee County Jail to evaluate HANNA.

51.     At no point on August 23, 2017 did NURSE POLANCO or SGT. LAUGHLIN request or recommend that HANNA be transported to any medical facility, including, but not limited to, a hospital or emergency room, outside of the Manatee County Jail.

52.     At no point on August 23, 2017 did any member of MCSO or ARMOR contact or request fire rescue or any other form of non-ARMOR emergency medical services respond to the Manatee County Jail to evaluate HANNA, or request or recommend that HANNA be transported to any medical facility, including, but not limited to, a hospital or emergency room, outside of the Manatee County Jail, or initiate a "med stat."

53.     HANNA was not seen by any physician, physician's assistant, or medical doctor on August 23, 2017.

54.     HANNA was ordered to return to housing and follow up only as needed.

### *Second Syncopal Episode*

55.     On or about September 8, 2017, Deputy Randy Geis of MCSO was assigned to work the disciplinary pod in the Manatee County Jail.

56.     At or around 6:50 p.m. that same day, while at or near cell 19, where HANNA was housed, Deputy Geis saw HANNA on the floor and asked him if he was alright.

57.     HANNA stood up and told Deputy Geis that he felt light headed, and then HANNA

fainted.

58. When HANNA fell due to fainting, he hit his head on a wall within the cell, as documented on the corresponding Urgent Care Assessment form dated September 8, 2017.

59. There was no other inmate or resident in cell 19 at that time.

60. Deputy Geis called a "med stat" over the radio and NURSE OGLINE and NURSE MONATYRE of ARMOR responded, along with Sergeant Dewayne Carr, Sergeant William McNeil, Deputy Shaun Feverston, Deputy Beverly Barbieri, Deputy Frank Rotger, Deputy Hetty Fuhrman, Deputy Michael Metzgar, and Deputy Ralf Meinzer, all of MCSO.

61. Deputy Geis entered the cell where HANNA was.

62. NURSE OGLINE and NURSE MONTAYRE attempted to evaluate HANNA.

63. HANNA was in a seated position near the sink in cell 19.

64. NURSE MONTAYRE attempted to take HANNA's blood pressure, but could not get a reading, so NURSE OGLINE attempted to take HANNA's blood pressure using a manual cuff and stethoscope.

65. No other vital signs were obtained or attempted to be obtained by either NURSE MONTAYRE or NURSE OGLINE at that time.

66. NURSE MONTAYRE did not attempt to question HANNA about what had happened, but NURSE OGLINE did.

67. HANNA complained of left finger pain to NURSE OGLINE and told her he "passed out, I think."

68. HANNA was transported to the medical unit within the Manatee County Jail where he was ordered to be monitored for 2 hours then returned to his cell if stable.

69. Again, at no point on September 8, 2017 did NURSE MONTAYRE or NURSE OGLINE contact or request fire rescue or any other form of non-ARMOR emergency medical

services respond to the Manatee County Jail to evaluate HANNA.

70.    At no point on September 8, 2017 did NURSE MONTAYRE or NURSE OGLINE recommend to anyone that fire rescue or any other form of non-ARMOR emergency medical services respond to the Manatee County Jail to evaluate HANNA.

71.    At no point on September 8, 2017 did NURSE MONTAYRE or NURSE OGLINE request or recommend that HANNA be transported to any medical facility, including, but not limited to, a hospital or emergency room, outside of the Manatee County Jail.

72.    At no point on September 8, 2017 did any member of MCSO or ARMOR contact or request fire rescue or any other form of non-ARMOR emergency medical services respond to the Manatee County Jail to evaluate HANNA, or request or recommend that HANNA be transported to any medical facility, including, but not limited to, a hospital or emergency room, outside of the Manatee County Jail.

73.    According to NURSE OGLINE's Urgent Care Assessment form, she did not notify a health care provider or order a follow-up.

74.    HANNA was not evaluated by any non-ARMOR, non-MCSO medical professional on September 8, 2017.

75.    HANNA was not transported to any medical facility, including, but not limited to, a hospital or emergency room, outside of the Manatee County Jail on September 8, 2017.

76.    HANNA was permitted to return to his cell later that same day.

### *Third Syncopal Episode*

77.    On or about September 9, 2017, Deputy Michael Braune was assigned to the area of the Manatee County Jail where HANNA was housed.

78.    At approximately 5:28 a.m., Deputy Braune passed cell 19 and saw HANNA lying face up on the floor underneath the toilet.

79. Deputy Braune entered cell 19 to check on HANNA.

80. HANNA was breathing but unresponsive to verbal or tactile stimulation.

81. Deputy Braune called a "med stat" and NURSE OGLINE and either NURSE R. GRETHER or NURSE D. GRETHER responded.[2]

82. NURSE OGLINE recorded a blood pressure of 80-62; an unreadable oxygen level; that HANNA moaned at times; that his hands were cold to the touch; that his respirations were deep and course, almost snore-like; and that his pupils were fixed.

83. Sgt. Carr of MCSO had master control activate emergency medical services, which arrived at or near 5:58 a.m., and North River Fire Rescue, which arrived at or near 6:10 a.m.

84. Deputies Christopher Zeris, Shaun Feverston, and Randy Geis responded and assisted in performing CPR on HANNA.

85. HANNA, EMS, and North River Fire Rescue exited the dorm at or near 6:28 a.m.

86. HANNA was transported to a nearby hospital.

87. HANNA has not regained consciousness and is in a persistent vegetative state.

### *Armor's Policies*

88. ARMOR's Policy J-A-01, titled "Access to Care," as applicable to the Manatee County Jail during all times material, defined "Access to Care" as meaning "that in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered."

89. ARMOR's Policy J-A-01 prohibits unreasonable barriers to access to care, including "[h]aving an understaffed, underfunded, or poorly organized system with the result that it is not able to deliver appropriate and timely care for patients serious health needs."

---

[2] PLAINTIFF is uncertain whether it was NURSE R. GRETHER or NURSE D. GRETHER who responded at this precise time. Based on information and belief, they are both nurses, spouses, and were employees of ARMOR at that time. The jail incident reports indicate only "Nurse Grether" and ARMOR's presuit discovery has not made the identity clear.

90.     ARMOR's Policy J-A-01.1, titled "Health Care Co-Pay," as applicable to the Manatee County Jail during all times material, stated that "Patients will receive appropriate health care based on need, without regard for financial status."

91.     ARMOR's Policy J-A-01.1 delineates that follow up visits to doctors that are scheduled for the same condition within 60 days are non-chargeable services, as are laboratory tests, x-rays, and emergency medical care requiring immediate outside medical intervention.

92.     ARMOR's Policy J-A-01.2, titled "Patients with Limited English Proficiency," as applicable to the Manatee County Jail during all times material, stated that all patients shall have equal access to health services, including those who, as a result of a physical condition, cannot speak, read, write, or understand the English language at a level that permits them to interact effectively with jail staff.

93.     ARMOR's Policy J-A-02, titled "Responsible Health Authority," as applicable to the Manatee County Jail during all times material, defined "Qualified Health Care Professionals" as "physicians, physician assistants, nurses, nurse practitioners, dentist, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients."

94.     ARMOR's Policy J-A-03, titled "Medical Autonomy," as applicable to the Manatee County Jail during all times material, stated that "[c]linical decisions and actions regarding health care provided to inmates to meet their serious medical needs are solely the responsibility of qualified health care professionals."

95.     ARMOR's Policy J-A-04.2, titled "Health Services Reports – Jails," as applicable to the Manatee County Jail during all times material, stated that statistics of the health services provided to inmates shall be gathered and reported and analyzed to identify trends in health services usage and to plan for staffing, space and equipment needs, and other needs of the health

care unit.

96.     ARMOR's Policy J-A-04.2 also stated that clinical visits, health assessments, emergency department visits, hospital admissions, hospital days, average hospital length of stay, off-site specialist visits, the number of inmates x-rayed, the number of x-ray films taken, the number of inmates who had any laboratory ordered, the total number of laboratory studies, the number of deaths, and the number of ambulance transports, among other data, were to be tracked.

97.     ARMOR's Policy J-A-05, titled "Policies and Procedures," as applicable to the Manatee County Jail at all times material, stated that health care policies are site specific, and the manual of compilation of policies and procedures is to be accessible to all health staff.

98.     ARMOR's Policy J-A-05 stated that a current manual was to be available at each unit and clinic area for continuous access to policies and procedures.

99.     ARMOR's Policy J-A-05 stated that staff members were responsible for practicing in compliance with policies and procedures, must review the manual upon employment and when revisions are made, and must sign a staff acknowledgement form.

100.     ARMOR's Policy J-A-07, titled "Emergency Response Plan," as applicable to the Manatee County Jail at all times material, defined "A Man-Down Drill" as "a simulated emergency affecting one individual who needs immediate medical intervention.  It involves life-threatening situations commonly experienced in correctional settings."

101.     ARMOR's Policy J-A-07 called for a man-down drill to be practiced once per year on each shift where staff was regularly assigned.

102.     ARMOR's Policy J-A-07 required on-site health care staff to notify the Health Service Administrator or designee of any emergency or disaster.

103.     ARMOR's Policy J-A-07.1, titled "Hurricane Plan," as applicable to the Manatee County Jail at all times material, required the Director(s) of Nursing to, *inter alia*, "[d]etermine

locations for the treatment of medical emergencies, if other than on the medical unit."

104.     ARMOR Policy J-A-08, titled "Communication on Patients' Health Needs," as applicable to the Manatee County Jail at all times material, required health and custody staff to communicate about patients with special needs conditions that may include, but not be limited to, being physically disabled.

105.     ARMOR Policy J-A-09, titled "Privacy of Care," as applicable to the Manatee County Jail at all times material, required that discussions among staff regarding patient care, and clinical encounters themselves, occur in private, without being observed or overheard by inmates and/or non-health staff.

106.     ARMOR Policy J-A-09 defined "Clinical Encounters" as "[i]nteractions between patients and health care professionals that involve a treatment and/or an exchange of confidential information."

107.     ARMOR Policy J-A-09 further stated that security personnel are only to be present if the patient posed a probable risk to the safety of the health care professional or others.

108.     ARMOR Policy J-A-09 also stated that when cell-side triage was required, health professionals must take extra precautions to promote private communication between health staff and the inmate.

109.     ARMOR's Policy J-A-10.1, titled "Mortality and Morbidity Review," as applicable to the Manatee County Jail at all times material, defined "morbidity" as "[a]ny illness or injury resulting in a 'near-death event.'"

110.     ARMOR's Policy J-A-10.1 defined "Sentinel Event" as "[a] patient safety event (not primarily related to the natural course of the patient's illness or underlying condition), that reaches the patient and results in any of the following: death, permanent harm, severe temporary harm and intervention required to sustain life,' and an event could still be considered a sentinel

event even if its outcome was not one of those three delineated.

111.     ARMOR's Policy J-A-10.1 required that a mortality or morbidity review to be conducted within 30 days following a patient's death or serious morbidity.

112.     ARMOR's Policy J-A-10.2, titled "Sentinel Events," as applicable to the Manatee County Jail at all times material, required that, upon identification of a sentinel event, adverse clinical event, or near miss clinical event, an Unusual Occurrence Report (OUR) be completed and emailed to the corporate office and the designated Risk Management officer.

113.     ARMOR's Policy J-A-10.2's definition of "Sentinel Event" was markedly similar to the definition of the same term in Policy J-A-10.1.

114.     ARMOR's Policy J-A-10.2 defined "Adverse Clinical Event," in part, as "an injury or death caused by medical management rather than by the patient's disease or condition."

115.     ARMOR's Policy J-A-10.2 defined "Near Miss Clinical Event" as "an error in clinical activity without a consequential adverse patient outcome.  For example, a wrong drug is dispensed but not administered to a patient."

116.     ARMOR Policy J-B-05, titled "Food Service Workers," as applicable to the Manatee County Jail at all times material, stated that inmates eligible for work in the kitchen area shall have their health records reviewed by the medical staff for, *inter alia*, current health problems and shall receive a Physical Assessment prior to assignment.

117.     ARMOR Policy J-C-03, titled "Professional Development," as applicable to the Manatee County Jail at all times material, required full-time qualified health care professionals to obtain 12 hours of continuing education per year, and part-time qualified health care professionals to prorate their continuing education hours based on full-time equivalency.

118.     ARMOR Policy J-C-04, titled "Health Training for Correctional Officers," as applicable to the Manatee County Jail at all times material, required that correctional officers who

work with inmates must receive health-related training at least every 2 years, which included, but was not limited to, administration of first aid, recognizing the need for emergency care and intervention in life-threatening situations, certification in CPR, recognizing acute manifestations of certain chronic illnesses, recognizing signs and symptoms of disabling conditions, procedures for patient transfers to appropriate medical facilities or health care providers, and responding to emergency conditions.

119.     ARMOR Policy J-C-04 further required that both correctional and health-care personnel be trained annually to respond to health-related situations within a four minute response time, with documentation of such training to be maintained by the Training Officer in institutional personnel files.

120.     ARMOR Policy J-C-04 does not require that 100% of the correctional staff who work with inmates at the Manatee County Jail at all times material be trained in all of the afore-mentioned areas delineated within Policy J-C-04.

121.     ARMOR Policy J-C-07, titled "Staffing," as applicable to the Manatee County Jail at all times material, called for a sufficient number of health staff of varying types to provide inmates with adequate and timely evaluation and treatment be in place consistent with contemporary standards of care.

122.     ARMOR Policy J-D-04, titled "Diagnostic Services," as applicable at the Manatee County Jail at all times material, called for all laboratory and diagnostic services to be provided in a timely manner.

123.     ARMOR Policy J-D-04 further stated that, at a minimum, the following diagnostic services were to be available on-site, including, but not limited to, "Radiology."

124.     However, ARMOR Policy J-D-03, titled "Clinic Space, Equipment, and Supplies," as applicable to the Manatee County Jail at all times material, did not require equipment capable

of performing electromyography (EMG), electroencephalogram (EEG), or electrocardiograms (EKG or ECG), magnetic resonance imaging (MRI), or computed tomography (CT or CAT Scan) to be available at the facility.

125.     ARMOR Policy J-D-04 stated that diagnostic studies not available at the Manatee County Jail were to be provided by a contracted service from a licensed local provider.

126.     ARMOR Policy J-D-04 required that laboratory procedures be logged using a Laboratory Log Sheet (#MG-013) and that EKG requests be logged using an EKG log (#MG-014).

127.     ARMOR Policy J-D-05, titled "Hospital and Specialty Care," as applicable to the Manatee County Jail at all times material, contemplated hospitalization and specialty care being available to patients in need of those services.

128.     ARMOR Policy J-D-05 further stated that "[p]atients who need health care beyond the resources available in the facility, as determined by the responsible physician, are transferred under appropriate security provisions to a facility where such care is on call or available 24 hours per day."

129.     ARMOR Policy J-D-05 stated that patients requiring emergency care or acute hospitalization would be sent to a community hospital.

130.     ARMOR Policy J-D-05 required correctional and health-care staff to be trained in proper emergency transfer procedures in order to facilitate the immediate transfer of patients.

131.     ARMOR Policy J-D-05 mandates that, when possible, the medical director or on-call provider should be contacted to approve transfer to an emergency department prior to such a transfer, but if such a person is not on-site, the charge nurse must notify the on-call provider of patient status/needs for emergency treatment and the patient is sent to the hospital.

132.     ARMOR Policy J-D-05 contemplates the completion of an Emergency Department Transfer Notification form (#AD-003), and for that form to be faxed to ARMOR's Utilization

Department at 888-215-4905.

133.    ARMOR Policy J-D-05 stated that interventions necessary for the maintenance of significant health issues were to be approved, including correction of a substantial functional deficit or existing pathological process that seriously threatened the well-being of the patient over time.

134.    ARMOR's Policy J-E-04, titled "Initial Health Assessment," as applicable to the Manatee County Jail at all times material, required that all patients receive an initial health assessment as soon as possible, but not later than 14 calendar days after admission to the facility.

135.    ARMOR's Policy J-E-07, titled "Non-Emergency Health Care Requests and Services," as applicable to the Manatee County Jail at all times material, required that patient encounters be documented on a Nursing Assessment Protocol Form (#NP-001 – NP-006) or in a SOAPE format in the patient's health record.

136.    ARMOR's Policy J-E-08, titled "Emergency Services," as applicable to the Manatee County Jail at all times material, required health care and/or correctional staff to respond to the area of an emergency within four minutes of being notified; to bring a wheelchair or stretcher, an AED, emergency jump bag, and portable oxygen.

137.    ARMOR's Policy J-E-08 further stated that, upon arrival to the scene, health care staff will provide appropriate immediate first aid, and document it using the Urgent Care Assessment form (#PT-037).

138.    ARMOR's Policy J-E-08 required that, if the situation is a life-threatening emergency, the first responders will activate emergency medical services (911) immediately, initiate CPR, apply AED, and notify a security supervisor of the need to transport the patient to an emergency department.

139.    ARMOR's Policy J-E-11, titled "Nursing Assessment Protocols," as applicable to

the Manatee County Jail at all times material, called for, *inter alia*, nursing staff to use Nursing Protocol Forms (#NP-001 – NP-006) to document subjective complaints, objective findings, assessment and impressions, treatment plans, and education in the inmate's health record.  If that form is not available for whatever reason, SOAPE notes should be entered as a Progress Note (#PT-043) in the patient's record.

140.  ARMOR's Policy J-E-11 does not require nurses to schedule a patient to see the health care provider unless that patient has been seen by a nurse more than two times in a thirty day period with the same complaint and has not already seen a clinician.

141.  ARMOR's Policy J-G-02, titled "Patients with Special Health Needs," as applicable to the Manatee County Jail at all times material, contemplated a proactive program that provided care for special needs patients who require close medical supervision or multidisciplinary care.  An individual treatment plan was to be developed and a master list of special needs patients was to be maintained.

142.  ARMOR's Policy J-G-02 provided a non-exhaustive list of special needs patients that included developmentally disabled individuals, those with brain injuries, patients with physical disabilities or other disabilities that limited daily functioning, and patients with recent hospitalizations, emergency room visits, and/or urgent care visits.

143.  ARMOR's Policy J-G-03.1, titled "Medical Housing Unit," as applicable to the Manatee County Jail at all times material, contemplated use of sheltered Medical Housing Unit only by patients requiring short-term medical observation, not those who require 24-hour per day nursing care.

144.  ARMOR's Policy J-G-03.1 stated that patients requiring acute care hospitalization would be transferred to contracted community facilities.

145.  ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively

Impaired," as applicable to the Manatee County Jail at all times material, contemplated advocacy for those patients who could not make sound decisions regarding his or her medical care likely due to the very illness or condition in need of treatment. That policy contemplated efforts to contact a patient's next of kind, lawyer, encouraged ARMOR's client to seek assistance from the presiding or probate court system, the State's Attorney, or for ARMOR staff to try to contact any other concerned and interested party that may offer help for the patient.

146. ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively Impaired" further acknowledged that advocacy for those patients "is a daily process that must continue until a safe resolution is found for the patient."

147. In the context of ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively Impaired," the term "Advocacy" was defined as "[ARMOR]'s support, care, and/or the appropriate health care facility placement for [its] patients. If necessary [ARMOR's] advocacy will include the pleading for help from any and all appropriate, interested parties.

148. ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively Impaired" contemplates that all efforts to communicate a patient's needs and find help will be documented on form MH-028, which must be entered into the patient's medical record.

149. ARMOR's Policy J-H-06, titled "Retention of Health Records," as applicable to the Manatee County Jail at all times material, required that health records of patients released or transferred be retained in a secured storage area for a minimum of seven years.

150. ARMOR's Policy J-I-04, titled "End of Life Decision Making," as applicable to the Manatee County Jail at all times material, did not contemplate ARMOR's ability and responsibility to coordinate end of life decision making and planning for patients who were unable to communicate or otherwise in a vegetative state, such as HANNA.

151.     ARMOR's Policy J-I-07, titled "Medically Necessary Care," as applicable to the Manatee County Jail at all times material, defined "medically necessary care" as including, but not necessarily limited to, "care appropriate for the diagnosis or treatment of a patient's condition, illness, or injury that threatens well-being, causes serious intractable pain, or can lead to significant deterioration or progression of disability"; "diagnostic, preventive, and treatment services (including supplies, appliances and devices), and follow-up care as determined by qualified, appropriate health providers in treating any serious condition, disease, or injury"; "inpatient care that is not available safely on an outpatient basis": "medical care consistent with generally accepted standards of medical practice, based on credible scientific evidence published in peer-reviewed, medical literature generally recognized by the relevant medical community as necessary for treatment of serious medical conditions"; and "not primarily rendered for the personal comfort and convenience of the patient, family, or provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury, or disease."

152.     ARMOR's policy and procedure manual, as applicable to the Manatee County Jail at all times material, included a list of references from sources such as American Correctional Association, National Commission on Correctional Health Care, Florida Corrections Accreditation Commission, Florida Model Jail Standards, Florida Statutes Chapters 454-493 and 765, Florida Administrative Code Chapter 64, and the Centers for Disease Control and Prevention.

### The Health Services Agreement Between Armor, County, and MCSO

153.     On or about September 25, 2012, a contract was executed by and between ARMOR, MCSO, and the COUNTY ("Original Agreement").[3]

154.     The Original Agreement had an effective date of October 1, 2012.

---

[3]          See Exhibit A.

155. The Original Agreement acknowledged the COUNTY and MSCO's respective statutory and constitutional duties and responsibilities "to provide necessary and proper medical, psychiatric, dental and other health care services for persons remanded to their care, custody and control within the county correctional system," which included the Manatee County Jail.

156. In the Original Agreement, ARMOR affirmed, *inter alia*, that it was qualified and authorized to provide all of the services required by the Original Agreement and had "substantial experience in the field of providing total health care services for persons incarcerated in public jails and prison facilities and ha[d] certain similar ongoing contracts and programs in other states of the union."

157. The Original Agreement had a term of three years, continuing in full force and effect through September 30, 2015 ("Initial Term").

158. Upon expiration of the Initial Term, the COUNTY, MCSO, and ARMOR were able to "mutually elect" to continue the Original Agreement for four additional one-year periods, after which the Original Agreement was to automatically renew for one-year periods for a maximum of four, one-year extensions unless a party provided six-months advanced written notice of its intention not to renew.

159. Under the Original Agreement, the COUNTY agreed to pay ARMOR in equal monthly installments in accord with the following base price for all its services:

    a. <u>1st Year of Initial Term</u> - $4,727,092.00 USD to be paid over 12 equal monthly installments of $393,924.00 USD;

    b. <u>2nd Year of Initial Term</u> - $4,827,630.00 USD to be paid over 12 equal monthly installments of $402,302.00 USD;

    c. <u>3rd Year of Initial Term</u> - $4,933,058.00 USD to be paid over 12 equal monthly installments of $411,088.00 USD;

160.     Under the Original Agreement, if the Initial Term was extended into a fourth year, the base price for that year was to be calculated using the base price of the third year, adjusted up or down but not by larger than 3% either direction.

161.     The Original Agreement contemplated alterations to base prices based on changes in inmate population.

162.     The Original Agreement required the COUNTY to pay ARMOR on a reimbursement basis for actual costs of "outside services" in excess of $750,000.00 USD per contract year.  If outside services costs exceeded $750,000.00 USD, ARMOR was to share in those costs between $750,000.00 USD and $950,000.00 USD at a rate of 50% with the COUNTY being responsible for the remaining 50%.  If outside services costs exceeded $950,000.00 USD in a contract year, the COUNTY would reimburse ARMOR 100%.

163.     For purposes of the Original Agreement, the phrase "outside services" was defined as: "inpatient and outpatient hospitalization, emergency room, hospital and physician fees, visits to off-site medical and dental specialists for consultation and treatment, off-sit hemodialysis treatment, laboratory and diagnostic services prescribed by an Outside Service provider which are unable to be performed on site and visits to special medical diagnostic facilities using equipment and/or services not available within the [Manatee County Jail] nor within the medical specialties or services of the staff or subcontractors."

164.     Under the Original Agreement, ARMOR had a duty to reasonably investigate and determine all potential third-party reimbursement sources, such as private health insurance, from residents at the Manatee County Jail.

165.     At all times material, HANNA did not have any third-party reimbursement sources.

166.     Under the Original Agreement, ARMOR was required to provide all medical and other health care services, including but not limited to, laboratory, x-ray, and pharmacy services,

excluding non-emergency transportation by EMS.

167.     Under the Original Agreement, ARMOR was required to provide necessary emergency medical care and treatment 24 hours per day, 7 days per week to the inmates at the Manatee County Jail to be performed either on-site, where the person is housed, or at an emergency medical care facility or hospital.  For each contract year, ARMOR was financially responsible for the first $40,000 of transportation cost not reimbursed by the inmate for emergency medical services.

168.     Under the Original Agreement, ARMOR was responsible for arranging the admission of any inmate who required hospitalization, and was to be fully responsible for any and all costs or expenses incurred thereof, subject to Section 3.B of the Original Agreement.

169.     The COUNTY was required to appoint a designee as contract manager for the Original Agreement; a person who could, *inter alia*, make decisions pertinent to the agreement.

170.     The Original Agreement mandated that ARMOR shall recruit, select, train, promote, transfer, and release its personnel.

171.     The Original Agreement required ARMOR to comply with Florida Model Jail Standards and Florida Correctional Accreditation Commission requirements.

172.     The Original Agreement required ARMOR to meet, at a minimum, monthly with both the COUNTY and MSCO to review program implantation and program management.

173.     The Original Agreement required ARMOR to conduct health education programs for correctional officers of MCSO and ARMOR's own medical staff designed to raise the level of inmate care, and provide a list of such education and training programs conducted to MCSO on an annual basis.

174.     Under the Original Agreement, ARMOR was totally responsible for purchasing all medical/office supplies and maintaining it in good repair and satisfactory operating condition.

175.     On or about March 11, 2014, ARMOR, COUNTY, and MCSO executed an amendment to the Original Agreement with an effective date of November 15, 2013. ("First Amendment").[4]

176.     The First Amendment addressed previously-unknown needs for medical services to be provided to inmates that were relocated to the annex facility that was part of the Manatee County Jail.

177.     The First Amendment provided that the COUNTY must pay ARMOR an additional pro-rated monthly amount of $15,252.05 USD during November 2013 of the second year of the Initial Term; an additional $24,416.67 USD per month during the rest of the second year of the Initial Term; and an additional $24,950.06 USD per month during the third year of the Initial Term.

178.     On or about October 20, 2015, ARMOR, COUNTY, and MCSO executed a second amendment to the Original Agreement with an effective date of October 1, 2015 ("Second Amendment").

179.     The Second Amendment exercised Article 1, Paragraph B's renewal clause within the Original Agreement, extending the contract in full force and effect for an additional one-year, commencing October 1, 2015 through September 30, 2016.

180.     During the term of the Second Amendment, ARMOR's base price for the annex was $25,698.39 USD per month.

181.     All other terms in the Original Agreement and First Amendment remained in full force and effect.

182.     In December 2015, ARMOR, COUNTY, and MCSO executed a third amendment to the Original Agreement with an effective date of November 6, 2015 ("Third Amendment").

183.     The purpose of the Third Amendment was to revise the medical staffing plan

---

[4] All of the amendments to the Original Agreement are part of Exhibit A.

requirements at the Manatee County Jail. All other terms in Original Agreement, First Amendment, and Second Amendment remained in full force and effect.

184. In January of 2016, ARMOR, COUNTY, and MCSO executed a fourth amendment to the Original Agreement ("Fourth Amendment").

185. The Fourth Amendment addressed a pharmaceutical reimbursement to be paid to ARMOR. All other terms of the Original Agreement, First Amendment, Second Amendment, and Third Amendment remained in full force and effect.

186. In September and October 2016, ARMOR, COUNTY, and MCSO executed a fifth amendment to the Original Agreement ("Fifth Amendment").

187. The Fifth Amendment renewed the terms of the Original Agreement and its amendments for an additional year, beginning October 1, 2016 and ending on September 30, 2017.

188. During the term of the Fifth Amendment, ARMOR was to be paid a base price of $5,478.033.28 USD annually, via monthly payments of $456,502.77 USD.

189. All other terms of the Original Agreement and preceding four amendments remained in full force and effect.

190. In November 2017, ARMOR, COUNTY, and MCSO executed a sixth amendment to the Original Agreement ("Sixth Amendment").

191. The Sixth Amendment renewed the terms of the Original Agreement and its amendments for another one year, beginning October 1, 2017 and ending September 30, 2018.

192. During the term of the Sixth Amendment, ARMOR was to be paid a base price of $5606.374.28 USD annually, via monthly payments of $467,197.86 USD.

193. Article 5 which covered the scope of health services was altered by the Sixth Amendment, and the phrase "in the most cost-effective manner" was included.

194.     Based on information and belief, on or about February 11, 2011, William Campbell died of sepsis in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

195.     Based on information and belief, on or about October 10, 2011, Gary Joseph Smith died of pneumonia in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

196.     Based on information and belief, on or about January 2, 2012, Calvin Goldsmith died of sepsis in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

197.     Based on information and belief, in or around May 2012, Allen Daniel Hicks, Sr., suffered a stroke, became comatose, and died while in the custody of the Hillsborough County Sheriff's Office at a facility where ARMOR then provided health services, and that death was preventable.

198.     Based on information and belief, on or about July 7, 2012, Arthur Sacco died of sepsis in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

199.     Based on information and belief, on or about July 10, 2012, Raleigh Priester died of starvation in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

200.     Based on information and belief, on or about December 24, 2012, William Herring, Jr., died of starvation in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

201.     Based on information and belief, on or about January 7, 2015, Simon Valacheryil

died of a gastrointestinal bleed and infectious pericarditis in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

202.     Based on information and belief, on or about May 7, 2015, Daniel K. Davies was relegated to a vegetative and/or comatose and/or brain-damaged state in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that/those severe medical conditions were preventable.

203.     Based on information and belief, on or about April 1, 2016, Scott Burrell died of peritonitis in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

204.     Based on information and belief, on or about April 5, 2016, Stephen Obremski died of a gastrointestinal hemorrhage in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

205.     Based on information and belief, on or about May 16, 2016, April Farrah died of a gastrointestinal hemorrhage in the Broward County Jail in Florida, a facility at which ARMOR then provided health services, and that death was preventable.

206.     Based on information and belief, in 2013, the Pinellas County Sheriff's Office entered into a contract with ARMOR to provide health care services at facilities in Pinellas County, Florida.   That was the first time since the 1990s that Pinellas County or the Pinellas County Sheriff's Office agreed to outsource any portion of the medical treatment of its pretrial detainees and prisoners.   During that time, in or around 1994, a woman died in a Pinellas County and a nurse who worked for the private company who, at that time, provided health care services was subsequently deposed and admitted that she joked with jail staff, "We save money because we skip the ambulance and bring them right to the morgue."   Based on information and belief, ARMOR's contract with the Pinellas County Sheriff's Office was supposed to take effect on or near November

1, 2013 and remain in effect through 2015.  However, based on information and belief, the Pinellas County Sheriff's Office terminated or otherwise cancelled its contract with ARMOR due to a number of operational concerns and the money the Pinellas County Sheriff's Office fined ARMOR for failing to provide timely medical care to inmates.  As to operational concerns, based on information and belief, in the past physicians at the jail checked vital signs for inmates, but ARMOR considered that a task for nurses.

207.     Based on information and belief, in or about April 2016, nurses employed by ARMOR demonstrated a pattern of intentionally falsifying health care records within the course and scope of their employment, and ARMOR was subsequently criminally charged.  See, e.g. State of Wisconsin v. Armor Correctional Health Services, Inc., 2018-ML-4041, Milwaukee County, Wisconsin, Circuit Court.

208.     Based on information and belief, on or about July 11, 2016, the State of New York, by and through its Attorney General, Eric T. Schneiderman, Esq., filed a verified petition in the Supreme Court for the County of New York against ARMOR.  See The People of the State of New York v. Armor Correctional Health Medical Services of New York, Inc., P.C., et. al., Index No. 450835/2016, New York County, New York, Supreme Court.  That verified petition alleged, *inter alia*, that between 2011 and July of 2016, a total of 14 deaths occurred at Nassau and Niagara counties jails serviced by ARMOR, and the New York State Commission of Correction's Medical Review Board, which was charged with the oversight of jail and prison health care and the investigation of related morbidity and mortality incidents, "found egregious lapses in medical care in seven of the 14 deaths."  It further alleged that the New York Attorney General's own investigation revealed that ARMOR had not met its contractual obligations to Nassau County, New York, had inadequate self-assessments or self-audits, inadequate continuous quality improvement processes, inadequate diagnostic services, inadequate referrals to specialists,

inadequate staffing, and failure to maintain its equipment and accurate and complete medical records.

<u>**COUNT I – NEGLIGENT HIRING OF NURSE POLANCO**</u>
*(As to Defendant, Armor Correctional Health Services, Inc., only)*

209.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-152.

210.    At all times material, HANNA was a pretrial detainee in the Manatee County Jail and had no legal right to leave the premises.

211.    At all times material, NURSE POLANCO was an employee of ARMOR at the Manatee County Jail while HANNA was a pretrial detainee there.

212.    HANNA's interactions and/or encounters with NURSE POLANCO within the Manatee County Jail were a direct consequence of NURSE POLANCO's employment by ARMOR.

213.    ARMOR owed a duty to residents of the Manatee County Jail, including HANNA, to exercise reasonable care in its hiring of safe and competent medical personnel such as nurses, including NURSE POLANCO.

214.    ARMOR owed a duty to residents of the Manatee County Jail, including HANNA, to exercise a level of care which, under all the circumstances, a reasonably prudent employer would exercise in choosing an employee for the particular duties to be performed.

215.    ARMOR owed a duty to residents of the Manatee County Jail, including HANNA, to make an appropriate investigation of prospective employees such as NURSE POLANCO prior to hiring them.

216.    Based on information and belief, ARMOR breached the afore-stated duties.

217.    ARMOR knew, or in the exercise of reasonable care, should have known that NURSE POLANCO was unfit and/or incompetent to be employed as a nurse in the Manatee

County Jail.

218.    Based on information and belief, a reasonable pre-hiring investigation would have revealed the unsuitability of NURSE POLANCO for the particular duties to be performed by her for ARMOR.

219.    ARMOR knew, or in the exercise of reasonable care, should have known that NURSE POLANCO had previously been terminated from a similar or same position by Corizon Correctional Healthcare, the company that handled health services for the Manatee County Jail immediately prior to ARMOR's contract with MCSO and Manatee County.

220.    It was unreasonable for ARMOR to employ NURSE POLANCO in light of the information it knew or should have known.

221.    HANNA was within the zone of foreseeable risk created by NURSE POLANCO's employment.

222.    As a direct and proximate cause of ARMOR's breach of the afore-stated duties, HANNA sustained serious adverse health-related consequences due to the mis- and/or failure to correctly diagnoses his medical condition and needs on or about August 23, 2017; failure to render adequate medical care; failure to recommend adequate medical evaluation by physicians; and failure to transport HANNA to a non-MCSO, non-ARMOR medical facility such as an emergency room, urgent care, or hospital.

223.    As a direct and proximate cause of ARMOR's negligent hiring of NURSE POLANCO, HANNA suffered headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

224.    ARMOR's negligent hiring of NURSE POLANCO was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs,

lost wages, and loss of future earning capacity.

225. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against ARMOR for compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

**COUNT II – NEGLIGENT SUPERVISION**
*(As to Defendant, Armor Correctional Health Services, Inc., only)*

226. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-152 and 173.

227. At all times material, ARMOR was the employer of various persons it designated to work at the Manatee County Jail and, *inter alia*, provided health care services to residents at that jail such as HANNA, including, but not limited to, NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, NURSE SANDERS, NURSE R. GRETHER, NURSE D. GRETHER, DOCTOR PEREZ.

228. ARMOR's relationship with its employees gave rise to a legal duty to residents of the Manatee County Jail, including HANNA, for ARMOR to reasonably supervise them.

229. At all times material, ARMOR's policies, including, but not limited to, J-C-04 and J-C-05, required ARMOR to train correctional officers from MCSO that worked in the Manatee County Jail, which gave rise to a further legal duty to supervise its own employees' efforts to train those officers, and those MCSO officers to make sure they were trained.

230. The Original Agreement also required ARMOR to report to MCSO and COUNTY its training of MCSO correctional staff.

231. ARMOR negligently breached the afore-stated duties to supervise its own employees and MCSO correctional officers by:

    a. Failing to ensure compliance with ARMOR's policies;

b.  Failing to ensure compliance with the Original Agreement and its six Amendments;

c.  Failing to review the performance of nurses, doctors, and correctional officers in the provision of health services and care to residents, including HANNA, at the Manatee County Jail;

d.  Failing to review ARMOR employees' management and maintenance of medical charts and records, including HANNA's;

e.  Failing to review ARMOR employees' use of forms, reports, and designated documents in the performance of their duties;

f.  Failing to ensure ARMOR employees and MCSO correctional officers were properly trained;

g.  Failing to recognize misdiagnoses of medical conditions in residents at the Manatee County Jail, including HANNA;

h.  Failing to recognize ARMOR employees' failure to diagnose medical conditions in residents at the Manatee County jail, including HANNA;

i.  Failing to review ARMOR employees' medical treatment plans for residents in the Manatee County Jail, including HANNA;

j.  Failing to review decisions not to utilize emergency medical services for residents in the Manatee County Jail, including HANNA;

k.  Failing to review decisions not to utilize ambulance services for residents in the Manatee County Jail, including HANNA;

l.  Failing to review decisions not to order follow-up medical assessments by physicians for residents in the Manatee County Jail, including HANNA;

m.  Failing to review ARMOR employees' maintenance of medical equipment within the Manatee County Jail

   n. Failing to review ARMOR employees' decisions with respect to the provision of medical care for residents in the Manatee County Jail, including HANNA.

232. As a direct and proximate cause of ARMOR's negligent supervision, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

233. ARMOR's negligent supervision was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

234. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against ARMOR for compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

**COUNT III – NEGLIGENT FAILURE TO TRAIN**
*(As to Defendant, Armor Correctional Health Services, Inc., only)*

235. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-152 and 173.

236. At all times material, ARMOR owed a legal duty to the residents of the Manatee County Jail, including HANNA, to exercise reasonable care in retaining safe and competent employees, a material part of which is to provide them with reasonable training on a variety of subjects, including, but not limited to:

   a. Expectations pursuant to then-applicable ARMOR policies;

   b. Obligations under the Original Agreement and its six Amendments;

   c. Standard of care for provision of health services in the community;

   d. Assessing the medical needs of residents within the Manatee County Jail;

e.   Diagnosing medical conditions of residents within the Manatee County Jail;

f.   Treating medical conditions of residents within the Manatee County Jail;

g.   CPR;

h.   Medical emergencies;

i.   Chain of command;

j.   Utilization of non-MCSO medical services;

k.   Utilization of non-ARMOR medical services;

l.   Utilization of emergency medical services;

m.   Utilization of ambulance services;

n.   Hospitalization of residents of Manatee County Jail;

o.   Establishing medical treatment plans for residents of Manatee County Jail;

p.   Maintaining health records of residents of Manatee County Jail;

q.   Providing care to people in a comatose state; and,

r.   Providing care to people in a persistent vegetative state.

237.   At all times material, pursuant to ARMOR Policy J-C-04, J-D-05, and the terms of the Original Agreement and its six Amendments, ARMOR further had a duty to train correctional officers of MCSO that worked in the Manatee County Jail.

238.   At all times material, residents of the Manatee County Jail, including HANNA, were within a foreseeable zone of risk to be harmed, damaged, or injured by any breach of the afore-stated duties to train.

239.   At all times material, ARMOR breached its duties to train its employees and correctional officers of MCSO.

240.   As a direct and proximate cause of ARMOR's breach of its duties to train, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal

episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

241.   ARMOR's negligent training was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

242.   The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against ARMOR for compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

## COUNT IV - DELIBERATE INDIFFERENCE REGARDING HANNA'S SERIOUS MEDICAL NEEDS FOR AMBULATORY, EMERGENCY, SPECIALTY, AND OUTSIDE SERVICES
*(As to Defendant, Armor Correctional Health Services, Inc., only)*

243.   PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-208.

244.   The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

245.   At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

246.   At all times material, ARMOR was required to train its own employees and MCSO correctional officers in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

247.   At all times material, ARMOR and its employees and MCSO and COUNTY and

its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

248. At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

249. As such, at all times material, ARMOR and its employees were acting under the color of state law.

250. At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

251. At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

252. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, financially responsible for actual costs associated with "outside services," as defined Paragraph 3B(1) of the Original Agreement and Paragraph 163 herein, up to $750,000.00 USD per contract year. If outside service costs exceeded $750,000.00 USD but were equal to or less than $950,000.00 USD, ARMOR was responsible for 50% of those actual costs.

253. As part of the terms of the Original Agreement and its six Amendments, ARMOR

was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital. For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

254. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

255. At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

256. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

257. Based on information and belief, prior to and throughout HANNA's detention in

the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

258.    Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

259.    ARMOR had actual or constructive knowledge of the longstanding and widespread practices referenced herein and failed to take action to stop it.

260.    At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services.

261.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA.

262.    ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services.

263.    The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that ARMOR knew of and exhibited a

deliberate indifference to.

264.    At all times material, including, but not limited to, August 23, 2017 through the early-morning hours of September 9, 2017, ARMOR knew of HANNA's serious medical needs after he suffered from more than one syncopal episode, lost consciousness, hit his head, and complained of headaches.

265.    Following September 9, 2017, after HANNA returned to the Manatee County Jail from the hospital, ARMOR had actual or constructive knowledge that it and MCSO and COUNTY did not have the staff and equipment necessary to render adequate aid to HANNA and his serious medical needs, as he was in a persistent vegetative state, and remained deliberately indifferent to those needs and conditions.

266.    At all times material, including, ARMOR was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, and/or failing to transport to a hospital.

267.    As a direct and proximate cause of ARMOR's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state; it further subjected HANNA to unnecessary improper medical care, treatment, and housing after he returned to Manatee County Jail after September 9, 2017.

268.    ARMOR's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost

wages, and loss of future earning capacity.

269.     ARMOR's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

270.     The PLAINTIFF requests a trial by jury on all issues so triable in this count.

271.     PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against ARMOR for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

### COUNT V – VICARIOUS LIABILITY FOR EMPLOYEES' MEDICAL NEGLIGENCE
*(As to Defendant, Armor Correctional Health Services, Inc., only)*

272.     PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

273.     The common law doctrine of respondeat superior provides than an employer may be held liable for the actions of its employee if the employee was acting within the scope of his or her employment when he or she committed the tortious act.

274.     An employer is vicariously liable for compensatory damages resulting from the negligent acts of employees committed within the scope of their employment even if the employer is without fault.

275.     The well-established common law doctrines of vicarious liability and respondeat superior apply to negligence claims for medical malpractice, which is sometimes referred to as medical negligence.

276.     At all times material, ARMOR was the employer of NURSE POLANCO, NURSE OGLINE, MONTAYRE, and NURSE SANDERS.

277.     At all times material, ARMOR maintained an employer-employee and/or master-

servant relationship with NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS.

278. At all times material, NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS were nurses and health care providers as defined by Section 766.202, Florida Statutes.

279. At all times material, NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS worked as employees, servants, and/or agents of ARMOR in the Manatee County Jail.

280. At all times material, NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS had a duty to act within the prevailing professional standard of care for their respective types of health care providers, which was a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably prudent similar health care providers.

281. NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS afore-stated duties in Paragraph 278 herein extended to those residents of the Manatee County Jail, including HANNA, for whom they provided health care and services.

282. At all times material, NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS breached their respective duties by failing to recognize the presentation of serious signs and symptoms that required urgent and emergent referral to different health care providers, urgent care, and/or emergency care for further work-up and evaluation, and by failing to ensure that HANNA was referred to urgent and/or emergent health care facilities for further work-up and evaluation.

283. At all times material, the care provided to HANNA by NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS was not that of a reasonably

prudent, similar health care provider.

284.    At all times material, it was foreseeable to ARMOR and NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS that failure to render health services to residents of the Manatee County Jail, including HANNA, in a manner consistent with that of a reasonably prudent, similar health care provider would result in injuries and damages.

285.    As a direct and proximate cause of NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS' medical negligence, HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and has been rendered into a persistent vegetative state.

286.    A further direct and proximate cause of NURSE POLANCO, NURSE OGLINE, NURSE MONTAYRE, and NURSE SANDERS' medical negligence was that HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

287.    The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against ARMOR for compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

## COUNT VI – NEGLIGENT SUPERVISION AND RETENTION OF ARMOR
*(As to Defendant, Sheriff Rick Wells, in his official capacity only)*

288.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-208.

289.    SHERIFF WELLS is the Sheriff of MCSO and its top constitutional officer.  He was sworn in as Sheriff of MCSO on or about January 3, 2017.

290.    At all times material, the provision of health care and services to pretrial detainees

within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, was a governmental act.

291. At all times material, MCSO had a duty to provide reasonable and adequate health care and services to pretrial detainees in the Manatee County Jail, including HANNA.

292. At all times material, MCSO entered into a contract (to wit: Original Agreement) with ARMOR to have ARMOR provide the health care services to residents at the Manatee County Jail.

293. MCSO contracted ARMOR to perform its non-delegable duties described herein to ARMOR through the Original Agreement and its subsequent amendments.

294. The Original Agreement had an effective date of October 1, 2012 and provided for a three-year term.

295. The Original Agreement recognized MCSO's statutory and constitutional duties and responsibilities "to provide necessary and proper medical, psychiatric, dental and other health care services for persons remanded to their care, custody and control within the county correctional system," which included the Manatee County Jail. Pursuant to the Original Agreement, MCSO contracted ARMOR to undertake those duties and responsibilities on its behalf.

296. The Original Agreement required ARMOR to comply with, *inter alia*, Florida Model Jail Standards and Florida Correctional Accreditation Commission.

297. The Original Agreement contemplated MCSO having a regulatory and supervisory role and responsibilities over ARMOR and its performance under the contract, including, but not limited to, having ARMOR submit reports to MCSO.

298. At all times material, ARMOR was required to submit monthly and other periodic reports to MCSO that reported and/or analyzed the overall operation of the health care services program in general or the health status in particular of the inmates committed to the custody of

MCSO.  The dates and formats of these reports were to be determined between ARMOR, MCSO, and COUNTY "from time to time."

299.    The Original Agreement contemplated MCSO having monthly meetings with ARMOR to review program implementation and program management, but only between October 1, 2012 and December 31, 2012.

300.    None of the subsequent six amendments to the Original Agreement, several of which extended the terms of the contract, required ARMOR and MCSO to meet and review program implementation and program management.

301.    The Original Agreement required ARMOR to provide MCSO, on a yearly basis, a list of education and training programs it provided under the terms of the contract.

302.    The Original Agreement required monthly reports reviewing inmate health care usage and costs to be submitted from ARMOR to MCSO.  The form and detail of these reports was not defined but to be as "reasonably required by the COUNTY or [MCSO]."

303.    The Original Agreement required ARMOR to fully cooperate with MCSO in the submission of any reports, records, or documents required by any court, quasi-judicial agency, or state agency requesting the same "for any reasons whatsoever, or as may be required to support any provision or section of [the Original Agreement], without any additional charge, fee or assessment."

304.    The Original Agreement required ARMOR to "regularly confer" with MCSO concerning existing health related procedures and problems within the Manatee County Jail for the purpose of making changes, from time to time, of such procedures and other practices deemed reasonably advisable by MCSO.

305.    The Original Agreement required ARMOR to collaborate with MCSO to develop written standard administrative policies for use by ARMOR in its performance under the contract.

306. Within 60 days of the effective date of the Original Agreement, ARMOR was required to submit an inventory list of all equipment ARMOR purchased to perform under the contract, with ownership identified, and to then update that inventory list on an annual basis.

307. MCSO was party to the Second Amendment to the Original Agreement which extended the term of the contract, and therefore ARMOR's involvement in the provision of health care and services to residents of the Manatee County Jail, for another year, through September 30, 2016.

308. MCSO was a party to the Fifth Amendment to the Original Agreement which extended the term of the contract, and therefore ARMOR's involvement in the provision of health care and services to residents of the Manatee County Jail, including HANNA, for another year, through September 30, 2017.

309. Paragraph 15 of the Original Agreement, titled "Indemnification and Hold Harmless," required ARMOR to indemnify, defend, and hold harmless MCSO and its agents, employees, appointees, officers, administrators, successors, and/or assigns from any and all claims, demands, damages, actions, causes of actions, suits, judgments, or liabilities of any kind or nature, and further include any charges, expenses, attorney's fees for counsel, which arise out of or relate to the performance of, or failure to perform, any services, duties, or responsibilities of ARMOR pursuant to that contract ("Indemnification Clause").

310. The Indemnification Clause inherently dissuaded MCSO from performing its reasonable regulatory and supervisory role over ARMOR's performance under the Original Agreement, and to perform reasonable due diligence and investigation of ARMOR's performance under the Original Agreement prior to executing the Second and Fifth Amendments, which extended the term of the contract.

311. Paragraph 16 of the Original Agreement, titled "Insurance," had a provision

subtitled "No Waiver of Immunity," in which MCSO expressly reserved its rights or protections, including the limitations on waiver of sovereign immunity as set forth in Section 768.28, Florida Statutes ("Reservation of Immunity Clause").

312. The Reservation of Immunity Clause inherently dissuaded MCSO from performing its reasonable regulatory and supervisory role over ARMOR's performance under the Original Agreement, and to perform reasonable due diligence and investigation of ARMOR's performance under the Original Agreement prior to executing the Second and Fifth Amendments, which extended the term of the contract.

313. As Sheriff of MCSO, SHERIFF WELLS was the chief corrections officer of MCSO and had responsibility of monitoring ARMOR's performance under the Original Agreement and its amendments during his tenure, which applied equally to his predecessor, former Sheriff of MCSO, W. Brad Steube, in his then-official capacity.

314. SHERIFF WELLS is a successor in interest to former Sheriff W. Brad Steube.

315. SHERIFF WELLS had a duty to terminate the contract (to wit: Original Agreement and its subsequent amendments) with ARMOR, or otherwise not renew its terms, if, *inter alia*, ARMOR failed to adequately perform or provided inadequate health care services to residents in the Manatee County Jail.

316. Paragraph 1(b) of the Original Agreement contained a clause that allowed any party to that contract, including MCSO, to not renew its terms if it provided the other parties written notice at least 180 days prior to the anniversary date of its intention to not renew.

317. Paragraph 18A of the Original Agreement allowed for MCSO to unilaterally terminate the contract with ARMOR for convenience, without cause or reason, so long as the effective date of termination was preceded by a 150-day prior written notice of intent to the other parties.

318. Paragraph 18B of the Original Agreement allowed for MCSO to immediately terminate the contract with ARMOR for default if it gave written notice of a material breach or default in the performance of any of ARMOR's obligations under the contract, and if default, not having been cured within 30 days following such notice.

319. Paragraph 21 of the Original Agreement, titled "Responsibility of Inmate Care Upon Termination," stated should the contract expire or be terminated, even though total responsibility for providing health care services to all residents in Manatee County Jail, or those residents receiving health care services at off-site facilities, shall be assumed from ARMOR by MCSO, "nothing herein is intended to lessen or eliminate any contractual or professional service liability of ARMOR to any inmate in need of medical care during a transition period" ("Transition Clause").

320. The Transition Clause inherently dissuaded MCSO from performing its reasonable regulatory and supervisory role over ARMOR's performance under the Original Agreement because, even if the contract expired or was terminated, MCSO's protection from liability by ARMOR was not lessened or eliminated for an undefined period of time of transition.

321. MCSO had a duty to exercise reasonable care and due diligence before deciding whether to agree to renew the term of its contract with ARMOR before executing the Second and Fifth Amendments.

322. MCSO knew or, in the exercise of reasonable care and diligence, should have known that during the original three-year term of the Original Agreement and its first one-year renewal under the Second Amendment, ARMOR failed to adequately perform under the terms of the contract.

323. MCSO knew or, in the exercise of reasonable care and diligence, should have known that during the original three-year term of the Original Agreement and its first one-year

renewal under the Second Amendment, ARMOR was in breach of terms of the contract.

324.    MCSO knew or, in the exercise of reasonable care and diligence, should have known that during the original three-year term of the Original Agreement and its first one-year renewal under the Second Amendment, ARMOR was having substantively similar contracts with other counties and/or municipalities in Florida and around the country cancelled, voided, terminated, or otherwise not-renewed because of ARMOR's failure to adequately perform under those similar contracts, provide adequate health care and services, having pretrial detainees die in their care despite their deaths being preventable, failure to supervise their employees, failure to train their employees, demonstrating a practice and/or custom of deliberate indifference to pretrial detainees serious medical needs, and its nursing staff having a pattern of falsifying health records.

325.    MCSO's afore-stated duties in this count extended to residents of the Manatee County Jail, including HANNA, for who it was reasonably foreseeable that harm, injuries, or damages would be incurred as a direct and proximate result of ARMOR and/or its employees, agents, and/or servants.

326.    Based on information and belief, MCSO breached its afore-stated duties in this count by failing to exercise reasonable care and diligence in its regulation, supervision, and oversight of ARMOR in its attempt to perform under the Original Contract and its amendments.

327.    MCSO further breached its afore-stated duties in this count by executed the Second and Fifth Amendments to the Original Agreement.

328.    At all times material, by not terminating the contract with ARMOR, and then twice renewing it with the Second and Fifth Amendments, respectively, evinced MCSO's ratification and approval of ARMOR's conduct in the Manatee County Jail and at those other facilities where pretrial detainees died or where nurses demonstrated a pattern of falsifying health records.

329.    As a direct and proximate cause of MCSO's negligence as stated in this count,

HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and has been rendered into a persistent vegetative state.

330.     A further direct and proximate cause of MCSO's negligence as stated in this count, HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

331.     The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against SHERIFF WELLS in his official capacity as constitutional officer for MCSO, for compensatory damages, reserves the right to seek leave for punitive damages, and asks for any other relief this Court deems proper.

### COUNT VII – NEGLIGENT RETENTION OF MCSO EMPLOYEES
*(As to Defendant, Sheriff Rick Wells, in his official capacity only)*

332.     PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

333.     SHERIFF WELLS is the Sheriff of MCSO and its top constitutional officer.  He was sworn in as Sheriff of MCSO on or about January 3, 2017.

334.     At all times material, SHERIFF WELLS was the chief corrections officer of MCSO and had responsibility of monitoring his employees and agents working in the Manatee County Jail's qualifications and performance.

335.     At all times material, SHERIFF WELLS, in his official capacity on behalf of MCSO, was the employer to correctional officers and agents of MCSO that worked in the Manatee County Jail.

336.     At all times material, HANNA was a pretrial detainee in the Manatee County Jail.

337.     At all times material, the following were employees of MCSO at the Manatee County Jail while HANNA was a pretrial detainee there (collectively, "MCSO Employees"):

a. SGT. LAUGHLIN;

b. Dewayne Carr;

c. Michael Braune;

d. Jerry Reid;

e. Deborah Cielinski;

f. Andrew Gardieff;

g. William McNeil;

h. Randy Geis;

i. Thomas McGuire;

j. Michael Metzgar.

338. HANNA's interactions and/or encounters with the MCSO Employees within the Manatee County Jail were a direct consequence of their employment by MCSO.

339. SHERIFF WELLS owed a duty to residents of the Manatee County Jail, including HANNA, to exercise reasonable care in its employment of qualified, competent personnel as correctional officers, including the MCSO Employees.

340. SHERIFF WELLS owed a duty to residents of the Manatee County Jail, including HANNA, to exercise a level of care which, under all the circumstances, a reasonably prudent employer would exercise in supervising and retaining correctional employees for the particular duties to be performed in the Manatee County Jail.

341. SHERIFF WELLS owed a duty to residents of the Manatee County Jail, including HANNA, to make an appropriate investigation of employees such as the MCSO Employees from time to time.

342. SHERIFF WELLS had a duty to exercise reasonable care and diligence in supervising his employees, investigating their qualifications and performance, and to take

corrective action such as reprimand, require training, require certifications, reassign, or discharge.

343.    At all times material, SHERIFF WELLS knew, or in the exercise of reasonable care and diligence, should have known that several of his employees and agents working in the Manatee County Jail had problems with their respective fitness to perform their duties; including, but not limited to:

a.    SGT. LAUGHLIN had multiple incidents involving use of force and/or excessive force as early as 2012;

b.    Dewayne Carr could not pass field training program with Hillsborough County Sheriff's Office, and then once with MCSO failed to properly patrol, stole items from a staff cafeteria, went AWOL, was aware of a resident suffering from withdrawal and did no nothing, treated an inmate like slave, refused to take a suicidal resident to medical and/or suicide watch, did not properly respond to a resident's attempts to self-harm, failed to close and/or lock a door, did not allow a resident to have access to have toilet paper, told a resident who did not have toilet paper to use the sheet on his bed, and was repeatedly tardy beginning as early as 2003;

c.    Michael Braune's CPR certification expired on or about July 6, 2017 and was not renewed or re-certified before September 9, 2017, and he failed to report an injured resident at the jail, beginning as early as 2000;

d.    Jerry Reid exhibited conduct unbecoming of an officer by calling a female inappropriate names and leaving his key in a gun locker as early as 2009;

e.    Deborah Cielinski had gone AWOL and even refused a direct order to receive training in Master Control as early as 2001;

f.    Andrew Gardieff used personal emails from MCSO computers to try and intimidate a person or people as early as 2011;

g.    William McNeil exhibited anger in addressing squad violations and demonstrated

verbal abuse as early as 2007;

h.      Randy Geis allowed his CPR certification to expire on or about May 23, 2016 and not get re-certified until on or about October 16, 2016;

i.      Thomas McGuire had an expired CPR certification since April 2, 2017 and, based on information and belief, did not validly re-certify through at least September 9, 2017;

j.      Michael Metzgar had an expired CPR certification since April 2, 2017 and, based on information and belief, did not validly re-certify through at least September 9, 2017.

344.    At all times material, SHERIFF WELLS breached his afore-stated duties in this count by not taking reasonable steps to supervise the MCSO Employees, investigate their qualifications and performance, and take reasonable and appropriate corrective actions such as reprimand, train, require certifications, reassign, or discharge certain employees.

345.    It was reasonably foreseeable that SHERIFF WELLS retention of unfit employees working in the Manatee County Jail might harm, damage, or injure residents within it, including HANNA.

346.    As a direct and proximate cause of SHERIFF WELLS' negligence as stated in this count, HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, had inadequate CPR efforts performed on him; delay in treatment; delay in ambulatory and emergency care, and has been rendered into a persistent vegetative state.

347.    A further direct and proximate cause of SHERIFF WELLS' negligence as stated in this count, HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

348.    The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against SHERIFF WELLS in his official capacity as constitutional officer for MCSO, for compensatory damages, reserves the right to seek leave for punitive damages, and asks for any other relief this Court deems proper.

<u>**COUNT VIII – DELIBERATE INDIFFERENCE**</u>
*(As to Defendant, Sheriff Rick Wells, in his official capacity only)*

349.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-208.

350.    The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

351.    At all times material, MCSO and SHERIFF WELLs had a non-delegable duty to provide adequate health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

352.    At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and SHERIFF WELLS regulated and substantially funded ARMOR, who it contracted, to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

353.    At all times material, SHERIFF WELLS and MCSO further had a duty to train, supervise, control, and otherwise ensure that its employees and agents, and ARMOR and its employees and agents, working in the Manatee County Jail did not violate the constitutional rights of residents, including HANNA.

354.    At all times material, SHERIFF WELLS and MCSO had a duty to develop and implement policies on the hiring, supervision, retention, and training of MCSO employees and ARMOR and its employees working at the Manatee County Jail.

355.    At all times material, SHERIFF WELLS and MCSO breached its duties addressed

in this count and abdicated its policymaking and oversight responsibilities, thereby allowing and making it foreseeable that the incidents involving HANNA between August 23, 2017 and the early-morning hours of September 9, 2017 could happen.

356.     SHERIFF WELLS and MCSO's breaches subjected and/or caused HANNA to be subjected to a deprivation of his federal constitutional right to adequate health care as a pretrial detainee at the Manatee County Jail.

357.     At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

358.     At all times material, ARMOR and its employees and MCSO and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

359.     At all times material, ARMOR and its employees and MCSO and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

360.     As such, at all times material, ARMOR and its employees and MCSO and its employees were acting under the color of state law.

361.     Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals;

or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

362. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

363. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

364. SHERIFF WELLS and MCSO had actual or constructive knowledge of ARMOR's longstanding and widespread practices referenced herein and failed to take action to stop it within the Manatee County Jail.

365. SHERIFF WELLS and MCSO had a policy or custom to not reasonably scrutinize and evaluate ARMOR's performance under the Original Agreement and its six Amendments.

366. SHERIFF WELLS and MCSO had a policy or custom not to ensure ARMOR complied with its contractual obligations to report, either in writing or in person, to MCSO about its performance under the Original Agreement and its six Amendments.

367. SHERIFF WELLS and MCSO had a policy or custom to assume ARMOR was fulfilling its contractual obligation to train ARMOR and MCSO employees working in the

Manatee County Jail without exercising reasonable care and due diligence to ensure the trainings were being conducted adequately.

368. SHERIFF WELLS and MCSO had a policy or custom to allow employees to work in the Manatee County Jail without a current and valid CPR certification.

369. SHERIFF WELLS and MCSO knew or should have known of a systemic failure, a custom or policy, of MCSO correctional staff and ARMOR employees to properly assess resident's health conditions, timely activate emergency or ambulatory services, timely provide or coordinate the provision of specialty care, and timely arrange the transportation of residents to urgent cares and/or hospitals when it was needed.

370. SHERIFF WELLS and MCSO knew or should have known that MCSO correctional employees working within the Manatee County Jail were not properly trained with respect to the health care of residents, including, but not limited to, how to respond to emergent medical situations.

371. SHERIFF WELLS and MCSO had a policy or custom of allowing or condoning or ratifying the provision of inadequate health care to residents in the Manatee County Jail, including but not limited to HANNA.

372. SHERIFF WELLS and MCSO had a policy or custom of allowing or condoning or ratifying the deliberate indifference to the health care needs of residents in the Manatee County Jail, including but not limited to HANNA.

373. The afore-stated customs and policies in this count developed over time as SHERIFF WELLS and MCSO were party to ARMOR being paid millions of dollars.

374. The afore-stated customs and policies in this count were caused, in whole or in part, by SHERIFF WELLS knowing, actually or constructively, that MCSO was contractually indemnified by ARMOR from any claims arising from the Manatee County Jail.

375. The afore-stated customs and policies in this count were motivated by financial disincentives that SHERIFF WELLS knew, actually or constructively, such as the cost associated properly auditing or evaluating ARMOR's performance; terminating or not-renewing ARMOR's contract under the Original Agreement and having to either find and pay a new third-party vendor; or face the prospects of having to fund the cost of recruiting, hiring, training, and supervising people to work for MCSO or as agents thereof and provide the health care services constitutionally required in the Manatee County Jail, without the benefit of contractual indemnification by a third-party.

376. The afore-stated customs and policies in this count were motivated by convenience insofar as SHERIFF WELLS knew, actually or constructively, that having to terminate or not-renew ARMOR's contract under the Original Agreement and then find and pay a new-third party vendor or face the prospects of having to fund the cost of recruiting, hiring, training, and supervising people to work for MCSO or as agents thereof and provide the health care services constitutionally required in the Manatee County Jail, without the benefit of contractual indemnification by a third-party, would be time consuming and exhaust efforts and human capital.

377. As outlined throughout this Complaint, MCSO employees and ARMOR employees breached respective duties of care to provide proper medical care to HANNA while he was a resident of the Manatee County Jail.

378. SHERIFF WELLS and MCSO also knew, or in the exercise of reasonable diligence should have known, about the pattern of preventable deaths and/or onset of serious adverse health conditions to residents within the Manatee County Jail, and at other facilities serviced by ARMOR, due to a delay or failure to render proper medical treatment.

379. SHERIFF WELLS and MCSO also knew, or in the exercise of reasonable diligence should have known, that MCSO employees and/or ARMOR employees working in the Manatee

County Jail had a policy or custom of delaying the provision of reasonable and necessary medical care.

380.     Following September 9, 2017, after HANNA returned to the Manatee County Jail from the hospital, SHERIFF WELLS and MCSO had actual or constructive knowledge that ARMOR and MCSO did not have the staff and equipment necessary to render adequate aid to HANNA and his serious medical needs, as he was in a persistent vegetative state, and remained deliberately indifferent to those needs and conditions.

381.     At all times material, it was reasonably foreseeable that SHERIFF WELLS and MCSO's afore-stated policies and/or customs set forth in this count, and breaches of its duties as set forth in this count, would place residents in the Manatee County Jail, including HANNA, within a zone of risk to be damaged or harmed.

382.     As a direct and proximate cause of SHERIFF WELLS and MCSO's deliberate indifference as set forth in this count, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

383.     SHERIFF WELLS and MCSO's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

384.     SHERIFF WELLS and MCSO's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

385.     The PLAINTIFF requests a trial by jury on all issues so triable in this count.

386.     PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful

prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against ARMOR for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

### COUNT IX – NEGLIGENT RETENTION AND SUPERVISION OF ARMOR
*(As to Defendant, Board of County Commissions – Manatee County, Florida only)*

387.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-208.

388.    At all times material, the provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, was a governmental act.

389.    At all times material, COUNTY had a duty to provide reasonable and adequate health care and services to pretrial detainees in the Manatee County Jail, including HANNA.

390.    At all times material, COUNTY entered into a contract (to wit: Original Agreement) with ARMOR to have ARMOR provide the health care services to residents at the Manatee County Jail.

391.    COUNTY contracted ARMOR to perform the non-delegable duties described in herein, which would typically be addressed by MCSO on behalf of the COUNTY, to ARMOR through the Original Agreement and its subsequent amendments.

392.    The Original Agreement had an effective date of October 1, 2012 and provided for a three-year term.

393.    The Original Agreement recognized COUNTY's statutory and constitutional duties and responsibilities "to provide necessary and proper medical, psychiatric, dental and other health care services for persons remanded to their care, custody and control within the county correctional system," which included the Manatee County Jail.  Pursuant to the Original Agreement, MCSO

contracted ARMOR to undertake those duties and responsibilities on its behalf.

394. The Original Agreement required ARMOR to comply with, *inter alia*, Florida Model Jail Standards and Florida Correctional Accreditation Commission.

395. The Original Agreement contemplated COUNTY having a regulatory and supervisory role and responsibilities over ARMOR and its performance under the contract, including, but not limited to, having ARMOR submit reports to COUNTY.

396. At all times material, ARMOR was required to submit monthly and other periodic reports to COUNTY that reported and/or analyzed the overall operation of the health care services program in general or the health status in particular of the inmates committed to the custody of MCSO. The dates and formats of these reports were to be determined between ARMOR, MCSO, and COUNTY "from time to time."

397. The Original Agreement contemplated MCSO and/or COUNTY having monthly meetings with ARMOR to review program implementation and program management, but only between October 1, 2012 and December 31, 2012.

398. None of the subsequent six amendments to the Original Agreement, several of which extended the terms of the contract, required ARMOR and MCSO and/or COUNTY to meet and review program implementation and program management.

399. The Original Agreement required ARMOR to provide MCSO, on a yearly basis, a list of education and training programs it provided under the terms of the contract.

400. The Original Agreement required monthly reports reviewing inmate health care usage and costs to be submitted from ARMOR to COUNTY. The form and detail of these reports was not defined but to be as "reasonably required by the COUNTY or [MCSO]."

401. The Original Agreement required ARMOR to fully cooperate with COUNTY in the submission of any reports, records, or documents required by any court, quasi-judicial agency,

or state agency requesting the same "for any reasons whatsoever, or as may be required to support any provision or section of [the Original Agreement], without any additional charge, fee or assessment."

402. The Original Agreement required ARMOR to "regularly confer" with COUNTY concerning existing health related procedures and problems within the Manatee County Jail for the purpose of making changes, from time to time, of such procedures and other practices deemed reasonably advisable by MCSO.

403. The Original Agreement required ARMOR to collaborate with MCSO and/or COUNTY to develop written standard administrative policies for use by ARMOR in its performance under the contract.

404. Within 60 days of the effective date of the Original Agreement, ARMOR was required to submit an inventory list of all equipment ARMOR purchased to perform under the contract, with ownership identified, and to then update that inventory list on an annual basis.

405. COUNTY was party to the Second Amendment to the Original Agreement which extended the term of the contract, and therefore ARMOR's involvement in the provision of health care and services to residents of the Manatee County Jail, for another year, through September 30, 2016.

406. COUNTY was a party to the Fifth Amendment to the Original Agreement which extended the term of the contract, and therefore ARMOR's involvement in the provision of health care and services to residents of the Manatee County Jail, including HANNA, for another year, through September 30, 2017.

407. At all times material, COUNTY had a County Administrator designee to manage the Original Agreement and its amendments on behalf of the County, which had the authority to transmit instructions, receive information, interpret and define the policy of the COUNTY, and

make decisions pertinent to the contract with ARMOR.

408.    Paragraph 15 of the Original Agreement, titled "Indemnification and Hold Harmless," required ARMOR to indemnify, defend, and hold harmless COUNTY and its agents, employees, appointees, officers, administrators, successors, and/or assigns from any and all claims, demands, damages, actions, causes of actions, suits, judgments, or liabilities of any kind or nature, and further include any charges, expenses, attorney's fees for counsel, which arise out of or relate to the performance of, or failure to perform, any services, duties, or responsibilities of ARMOR pursuant to that contract ("Indemnification Clause").

409.    The Indemnification Clause inherently dissuaded COUNTY from performing its reasonable regulatory and supervisory role over ARMOR's performance under the Original Agreement, and to perform reasonable due diligence and investigation of ARMOR's performance under the Original Agreement prior to executing the Second and Fifth Amendments, which extended the term of the contract.

410.    Paragraph 16 of the Original Agreement, titled "Insurance," had a provision subtitled "No Waiver of Immunity," in which COUNTY expressly reserved its rights or protections, including the limitations on waiver of sovereign immunity as set forth in Section 768.28, Florida Statutes ("Reservation of Immunity Clause").

411.    The Reservation of Immunity Clause inherently dissuaded COUNTY from performing its reasonable regulatory and supervisory role over ARMOR's performance under the Original Agreement, and to perform reasonable due diligence and investigation of ARMOR's performance under the Original Agreement prior to executing the Second and Fifth Amendments, which extended the term of the contract.

412.    As Board of County Commissioners for Manatee County, Florida, COUNTY had responsibility of monitoring ARMOR's performance under the Original Agreement and its

amendments.

413.    COUNTY had a duty to terminate the contract (to wit: Original Agreement and its subsequent amendments) with ARMOR, or otherwise not renew its terms, if, *inter alia*, ARMOR failed to adequately perform or provided inadequate health care services to residents in the Manatee County Jail.

414.    Paragraph 1(b) of the Original Agreement contained a clause that allowed any party to that contract, including COUNTY, to not renew its terms if it provided the other parties written notice at least 180 days prior to the anniversary date of its intention to not renew.

415.    Paragraph 18A of the Original Agreement allowed for COUNTY to unilaterally terminate the contract with ARMOR for convenience, without cause or reason, so long as the effective date of termination was preceded by a 150-day prior written notice of intent to the other parties.

416.    Paragraph 18B of the Original Agreement allowed for COUNTY to immediately terminate the contract with ARMOR for default if it gave written notice of a material breach or default in the performance of any of ARMOR's obligations under the contract, and if default, not having been cured within 30 days following such notice.

417.    Paragraph 21 of the Original Agreement, titled "Responsibility of Inmate Care Upon Termination," stated should the contract expire or be terminated, even though total responsibility for providing health care services to all residents in Manatee County Jail, or those residents receiving health care services at off-site facilities, shall be assumed from ARMOR by MCSO, "nothing herein is intended to lessen or eliminate any contractual or professional service liability of ARMOR to any inmate in need of medical care during a transition period" ("Transition Clause").

418.    The Transition Clause inherently dissuaded MCSO and COUNTY from performing

their reasonable regulatory and supervisory role over ARMOR's performance under the Original Agreement because, even if the contract expired or was terminated, MCSO's and COUNTY's protection from liability by ARMOR was not lessened or eliminated for an undefined period of time of transition.

419.    COUNTY had a duty to exercise reasonable care and due diligence before deciding whether to agree to renew the term of its contract with ARMOR before executing the Second and Fifth Amendments.

420.    COUNTY knew or, in the exercise of reasonable care and diligence, should have known that during the original three-year term of the Original Agreement and its first one-year renewal under the Second Amendment, ARMOR failed to adequately perform under the terms of the contract.

421.    COUNTY knew or, in the exercise of reasonable care and diligence, should have known that during the original three-year term of the Original Agreement and its first one-year renewal under the Second Amendment, ARMOR was in breach of terms of the contract.

422.    COUNTY knew or, in the exercise of reasonable care and diligence, should have known that during the original three-year term of the Original Agreement and its first one-year renewal under the Second Amendment, ARMOR was having substantively similar contracts with other counties and/or municipalities in Florida and around the country cancelled, voided, terminated, or otherwise not-renewed because of ARMOR's failure to adequately perform under those similar contracts, provide adequate health care and services, having pretrial detainees die in their care despite their deaths being preventable, failure to supervise their employees, failure to train their employees, demonstrating a practice and/or custom of deliberate indifference to pretrial detainees serious medical needs, and its nursing staff having a pattern of falsifying health records.

423.    COUNTY's afore-stated duties in this count extended to residents of the Manatee

County Jail, including HANNA, for who it was reasonably foreseeable that harm, injuries, or damages would be incurred as a direct and proximate result of ARMOR and/or its employees, agents, and/or servants.

424.     Based on information and belief, COUNTY breached its afore-stated duties in this count by failing to exercise reasonable care and diligence in its regulation, supervision, and oversight of ARMOR in its attempt to perform under the Original Contract and its amendments.

425.     COUNTY further breached its afore-stated duties in this count by executed the Second and Fifth Amendments to the Original Agreement.

426.     At all times material, by not terminating the contract with ARMOR, and then twice renewing it with the Second and Fifth Amendments, respectively, evinced COUNTY's ratification and approval of ARMOR's conduct in the Manatee County Jail and at those other facilities where pretrial detainees died or where nurses demonstrated a pattern of falsifying health records.

427.     As a direct and proximate cause of COUNTY's negligence as stated in this count, HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and has been rendered into a persistent vegetative state.

428.     A further direct and proximate cause of COUNTY's negligence as stated in this count, HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

429.     The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against COUNTY in its official capacity on behalf of Manatee County, Florida, for compensatory damages, reserves the right to seek leave for punitive damages, and asks for any other relief this Court deems proper.

430.     PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-208.

431.     The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

432.     At all times material, COUNTY had a non-delegable duty to provide adequate health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

433.     At all times material, by virtue of the Original Agreement and its six Amendments, COUNTY regulated and substantially funded ARMOR, who it contracted, to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

434.     At all times material, COUNTY further had a duty to appoint a contract manager, train that person or persons, supervise that person or persons, and further supervise control, and otherwise ensure that its employees and agents, and ARMOR and its employees and agents, working in the Manatee County Jail did not violate the constitutional rights of residents, including HANNA.

435.     At all times material, COUNTY had a duty to develop and implement policies on the hiring, supervision, retention, and training of ARMOR and its employees working at the Manatee County Jail.

436.     At all times material, COUNTY breached its duties addressed in this count and abdicated its policymaking and oversight responsibilities, thereby allowing and making it foreseeable that the incidents involving HANNA between August 23, 2017 and the early-morning hours of September 9, 2017 could happen.

437. COUNTY's breaches subjected and/or caused HANNA to be subjected to a deprivation of his federal constitutional right to adequate health care as a pretrial detainee at the Manatee County Jail.

438. At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

439. At all times material, ARMOR and its employees and COUNTY and its employees or agents worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA, pursuant to the Original Agreement and its amendments.

440. At all times material, ARMOR and its employees and COUNTY and its employees or agents closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA, pursuant to the Original Agreement and its amendments.

441. At all times material, ARMOR and its employees and COUNTY and its employees and agents were acting under the color of state law.

442. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

443. Based on information and belief, prior to and throughout HANNA's detention in

the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

444.    Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

445.    COUNTY had actual or constructive knowledge of ARMOR's longstanding and widespread practices referenced in this count and failed to take action to stop it within the Manatee County Jail.

446.    COUNTY had a policy or custom to not reasonably scrutinize and evaluate prospective contractors such as ARMOR prior to engaging them for services.

447.    COUNTY had a policy or custom to not reasonably scrutinize and evaluate ARMOR's performance under the Original Agreement and its six Amendments.

448.    COUNTY had a policy or custom not to ensure ARMOR complied with its contractual obligations to report, either in writing or in person, to MCSO about its performance under the Original Agreement and its six Amendments.

449.    COUNTY had a policy or custom to assume ARMOR was fulfilling its contractual obligation to train ARMOR and MCSO employees working in the Manatee County Jail without exercising reasonable care and due diligence to ensure the trainings were being conducted

adequately.

450. COUNTY knew or should have known of a systemic failure, a custom or policy, of MCSO correctional staff and ARMOR employees to properly assess residents' health conditions, timely activate emergency or ambulatory services, timely provide or coordinate the provision of specialty care, and timely arrange the transportation of residents to urgent cares and/or hospitals when it was needed.

451. COUNTY knew or should have known that people working within the Manatee County Jail were not properly trained with respect to the health care of residents, including, but not limited to, how to respond to emergent medical situations.

452. COUNTY had a policy or custom of allowing or condoning or ratifying the provision of inadequate health care to residents in the Manatee County Jail, including but not limited to HANNA.

453. COUNTY had a policy or custom of allowing or condoning or ratifying the deliberate indifference to the health care needs of residents in the Manatee County Jail, including but not limited to HANNA.

454. COUNTY had actual or constructive knowledge that ARMOR did not maintain adequate staff and/or equipment to adequately care for HANNA in his condition, including but not limited persistent vegetative state, when HANNA returned to the Manatee County Jail after being evaluated at a local hospital, and was deliberately indifferent to those needs and conditions.

455. The afore-stated customs and policies in this count developed over time as COUNTY was party to ARMOR being paid millions of dollars under the Original Agreement and its amendments.

456. The afore-stated customs and policies in this count were caused, in whole or in part, by COUNTY knowing, actually or constructively, that COUNTY was contractually indemnified

by ARMOR from any claims arising from the Manatee County Jail.

457.    The afore-stated customs and policies in this count were motivated by financial disincentives that COUNTY knew, actually or constructively, such as the cost associated properly auditing or evaluating ARMOR's performance; terminating or not-renewing ARMOR's contract under the Original Agreement and having to either find and pay a new third-party vendor; or face the prospects of having to fund the cost of recruiting, hiring, training, and supervising people to work for COUNTY or as agents thereof and provide the health care services constitutionally required in the Manatee County Jail, without the benefit of contractual indemnification by a third-party.

458.    The afore-stated customs and policies in this count were motivated by convenience insofar as COUNTY knew, actually or constructively, that having to terminate or not-renew ARMOR's contract under the Original Agreement and then find and pay a new-third party vendor or face the prospects of having to fund the cost of recruiting, hiring, training, and supervising people to work for COUNTY or as agents thereof and provide the health care services constitutionally required in the Manatee County Jail, without the benefit of contractual indemnification by a third-party, would be time consuming and exhaust efforts and human capital.

459.    As outlined throughout this Complaint, COUNTY and MCSO employees and ARMOR employees breached respective duties of care to provide proper medical care to HANNA while he was a resident of the Manatee County Jail.

460.    COUNTY also knew, or in the exercise of reasonable diligence should have known, about the pattern of preventable deaths and/or onset of serious adverse health conditions to residents within the Manatee County Jail, and at other facilities serviced by ARMOR, due to a delay or failure to render proper medical treatment.

461.    COUNTY also knew, or in the exercise of reasonable diligence should have known,

that MCSO employees and/or ARMOR employees working in the Manatee County Jail had a policy or custom of delaying the provision of reasonable and necessary medical care.

462. Nevertheless, at all times material COUNTY failed to take action to prevent any further deliberate indifference, or delay and/or failure to render proper medical treatment in the Manatee County Jail.

463. At all times material, it was reasonably foreseeable that COUNTY's afore-stated policies and/or customs set forth in this count, and breaches of its duties as set forth in this count, would place residents in the Manatee County Jail, including HANNA, within a zone of risk to be damaged or harmed.

464. As a direct and proximate cause of COUNTY's deliberate indifference as set forth in this count, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

465. COUNTY's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

466. COUNTY's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

467. PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

468. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against COUNTY in its official capacity on behalf of Manatee County, Florida, for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

*(As to Defendant, Nurse Leila Polanco, only)*

469.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

470.    At all times material, NURSE POLANCO was a health care provider as defined by Section 766.202, Florida Statutes.

471.    At all times material, NURSE POLANCO was an employee or agent of ARMOR.

472.    At all times material, NURSE POLANCO worked in the Manatee County Jail.

473.    At all times material, NURSE POLANCO had a duty to act within the prevailing professional standard of care for their respective types of health care providers, which was a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably prudent similar health care providers.

474.    NURSE POLANCO's afore-stated duties extended to residents of the Manatee County Jail, including HANNA, for whom she provided health care and services.

475.    At all times material, NURSE POLANCO breached her respective duties by failing to recognize the presentation of serious signs and symptoms that required urgent and emergent referral to different health care providers, urgent care, and/or emergency care for further work-up and evaluation, and by failing to ensure that HANNA was referred to urgent and/or emergent health care facilities for further work-up and evaluation.

476.    At all times NURSE POLANCO breached her respective duties by failing to recommend that HANNA receive laboratory and/or diagnostic examinations performed to aid in the diagnoses and/or treatment of his condition.

477.    At all times material, the care provided to HANNA by NURSE POLANCO was not that of a reasonably prudent, similar health care provider.

478.    At all times material, it was foreseeable to NURSE POLANCO that failure to

render health services to residents of the Manatee County Jail, including HANNA, in a manner consistent with that of a reasonably prudent, similar health care provider would result in injuries and damages.

479. As a direct and proximate cause of NURSE POLANCO's medical negligence, HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and has been rendered into a persistent vegetative state.

480. A further direct and proximate cause of NURSE POLANCO's medical negligence was that HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

481. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE POLANCO for compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

## COUNT XII – DELIBERATE INDIFFERENCE
*(As to Defendant, Nurse Leila Polanco, only)*

482. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

483. The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

484. At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

485. At all times material, ARMOR was required to train its own employees in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

486. At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

487. At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

488. As such, at all times material, ARMOR and its employees, including NURSE POLANCO, were acting under the color of state law.

489. At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

490. At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

491. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to provide all necessary emergency medical care and

treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital. For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

492.     As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

493.     At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

494.     Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

495.     Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to

Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

496.    Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

497.    NURSE POLANCO had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

498.    At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services, and NURSE POLANCO knew of this.

499.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA, and NURSE POLANCO knew this and acted consistently therewith.

500.    ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services, and NURSE POLANCO knew this and acted consistently therewith.

501.    The considerations set forth in this count placed residents at the Manatee County

Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that NURSE POLANCO knew of and exhibited a deliberate indifference to.

502. On or about August 23, 2017, NURSE POLANCO had actual knowledge that HANNA had lost consciousness in the exercise yard at the Manatee County Jail, complained of headaches, was told by other residents that HANNA had a seizure, and later viewed video surveillance of the incident confirming that HANNA did, in fact, faint and fall to the ground, hit his head, and remain on the ground for approximately 41 seconds.

503. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have certain laboratory and/or diagnostic evaluations to further aid in diagnosing and rendering adequate health care to his condition, and also to prevent a worsening of his condition, and was deliberately indifferent to those needs.

504. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be evaluated by a physician and was deliberately indifferent to those needs.

505. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed emergency, ambulance, and/or urgent care to an outside facility beyond Manatee County Jail because the medical staff and/or equipment in the Manatee County Jail was inadequate to reasonably care for HANNA and was deliberately indifferent to those needs.

506. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be monitored for an extended period of time and not released back to his cell where he would reside by himself and was deliberately indifferent to those needs.

507. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have a follow-up evaluation with a physician and was deliberately indifferent to those needs.

508. Following September 9, 2017, after HANNA returned to Manatee Memorial Jail

from a local hospital, NURSE POLANCO knew that ARMOR and MCSO did not maintain adequate staff and/or medical equipment in the Manatee County Jail to render adequate medical care to HANNA, who had serious conditions including being in a persistent vegetative state, and was deliberately indifferent to those needs and conditions.

509.    At all times material, NURSE POLANCO was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, and/or failing to transport to a hospital.

510.    As a direct and proximate cause of NURSE POLANCO's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

511.    NURSE POLANCO's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

512.    NURSE POLANCO's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

513.    The PLAINTIFF requests a trial by jury on all issues so triable in this count.

514.    PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE POLANCO

for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

**COUNT XIII – MEDICAL NEGLIGENCE**
*(As to Defendant, Nurse Carma Ogline, only)*

515.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

516.    At all times material, NURSE OGLINE was a health care provider as defined by Section 766.202, Florida Statutes.

517.    At all times material, NURSE OGLINE was an employee or agent of ARMOR. At all times material, NURSE OGLINE worked in the Manatee County Jail.

518.    At all times material, NURSE OGLINE had a duty to act within the prevailing professional standard of care for their respective types of health care providers, which was a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably prudent similar health care providers.

519.    NURSE OGLINE's afore-stated duties extended to residents of the Manatee County Jail, including HANNA, for whom she provided health care and services.

520.    At all times material, NURSE OGLINE breached her respective duties by failing to recognize the presentation of serious signs and symptoms that required urgent and emergent referral to different health care providers, urgent care, and/or emergency care for further work-up and evaluation, and by failing to ensure (and timely ensure) that HANNA was referred to urgent and/or emergent health care facilities for further work-up and evaluation.

521.    At all times NURSE OGLINE breached her respective duties by failing to recommend that HANNA receive laboratory and/or diagnostic examinations performed to aid in the diagnoses and/or treatment of his condition.

522.    At all times material, the care provided to HANNA by NURSE OGLINE was not

that of a reasonably prudent, similar health care provider.

523.    At all times material, it was foreseeable to NURSE OGLINE that failure to render health services to residents of the Manatee County Jail, including HANNA, in a manner consistent with that of a reasonably prudent, similar health care provider would result in injuries and damages.

524.    As a direct and proximate cause of NURSE OGLINE's medical negligence, HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and has been rendered into a persistent vegetative state.

525.    A further direct and proximate cause of NURSE OGLINE's medical negligence was that HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

526.    The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE OGLINE for compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

### COUNT XIV – DELIBERATE INDIFFERENCE
*(As to Defendant, Nurse Carma Ogline, only)*

527.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

528.    The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

529.    At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including

HANNA.

530.    At all times material, ARMOR was required to train its own employees in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

531.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

532.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

533.    As such, at all times material, ARMOR and its employees, including NURSE OGLINE, were acting under the color of state law.

534.    At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

535.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

536.    As part of the terms of the Original Agreement and its six Amendments, ARMOR

was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital. For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

537. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

538. At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

539. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

540. Based on information and belief, prior to and throughout HANNA's detention in

the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

541. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

542. NURSE OGLINE had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

543. At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services, and NURSE OGLINE knew of this.

544. At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA, and NURSE OGLINE knew this and acted consistently therewith.

545. ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services, and NURSE OGLINE knew this and acted consistently therewith.

546.    The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that NURSE OGLINE knew of and exhibited a deliberate indifference to.

547.    On or about August 23, 2017, HANNA lost consciousness in the exercise yard at the Manatee County Jail, complained of headaches; NURSE POLANCO responded and was told by other residents that HANNA had a seizure, and later viewed video surveillance of the incident confirming that HANNA did, in fact, faint and fall to the ground, hit his head, and remain on the ground for approximately 41 seconds.

548.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have certain laboratory and/or diagnostic evaluations to further aid in diagnosing and rendering adequate health care to his condition, and also to prevent a worsening of his condition, and was deliberately indifferent to those needs.

549.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be evaluated by a physician and was deliberately indifferent to those needs.

550.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed emergency, ambulance, and/or urgent care to an outside facility beyond Manatee County Jail because the medical staff and/or equipment in the Manatee County Jail was inadequate to reasonably care for HANNA and was deliberately indifferent to those needs.

551.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be monitored for an extended period of time and not released back to his cell where he would reside by himself and was deliberately indifferent to those needs.

552.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have a follow-up evaluation with a physician and was deliberately indifferent to those needs.

553.    At all times material, NURSE OGLINE had actual or constructive knowledge of the substance of the preceding averments in this count.

554.    On or about September 8, 2017, a "med stat" was called over the radio in the Manatee County Jail and NURSE OGLINE responded to Cell 19 where HANNA was housed.

555.    NURSE OGLINE had actual or constructive knowledge that, prior to the "med stat" call on September 8, 2017, Deputy Geis of MCSO saw HANNA on the floor of his cell, asked him if he was alright, HANNA stood up and said he felt light headed, then HANNA fainted again.

556.    After performing a cursory evaluation of HANNA on September 8, 2017, NURSE OGLINE, knowing of HANNA's serious needs for urgent, ambulatory, specialty, diagnostic, and/or emergency care allowed HANNA to be returned to his cell alone.

557.    On or about September 8, 2017, NURSE OGLINE was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, and/or failing to transport to a hospital.

558.    On or about September 9, 2017, a "med stat" was called in the Manatee County Jail and NURSE OGLINE responded to Cell 19 where HANNA was housed.

559.    NURSE OGLINE had actual or constructive knowledge that, prior to the "med stat" on September 9, 2017, HANNA was found unresponsive on the floor in his cell.

560.    On or about September 9, 2017, NURSE OGLINE was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to timely render adequate treatment, allowing CPR to be performed by uncertified MCSO employee(s), failing to timely refer to a doctor, failing to timely run diagnostic

testing, failing to timely activate EMS, failing to timely activate 911, failing to timely request ambulatory services, failing to timely arrange specialty care, failing to timely arrange transport to an urgent care, failing to timely arrange transport to an emergency room, and/or failing to timely transport to a hospital.

561. Following September 9, 2017, after HANNA returned to Manatee Memorial Jail from a local hospital, NURSE OGLINE knew that ARMOR and MCSO did not maintain adequate staff and/or medical equipment in the Manatee County Jail to render adequate medical care to HANNA, who had serious conditions including being in a persistent vegetative state, and was deliberately indifferent to those needs and conditions.

562. As a direct and proximate cause of NURSE OGLINE's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

563. NURSE OGLINE's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

564. NURSE OGLINE's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

565. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

566. PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE OGLINE for compensatory damages, punitive damages, attorneys' fees, and other proper relief.

567.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

568.    At all times material, NURSE MONTAYRE was a health care provider as defined by Section 766.202, Florida Statutes.

569.    At all times material, NURSE MONTAYRE was an employee or agent of ARMOR.

570.    At all times material, NURSE MONTAYRE worked in the Manatee County Jail.

571.    At all times material, NURSE MONTAYRE had a duty to act within the prevailing professional standard of care for their respective types of health care providers, which was a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably prudent similar health care providers.

572.    NURSE MONTAYRE's afore-stated duties extended to residents of the Manatee County Jail, including HANNA, for whom she provided health care and services.

573.    At all times material, NURSE MONTAYRE breached his respective duties by failing to recognize the presentation of serious signs and symptoms that required urgent and emergent referral to different health care providers, urgent care, and/or emergency care for further work-up and evaluation, and by failing to ensure that HANNA was referred to urgent and/or emergent health care facilities for further work-up and evaluation.

574.    At all times NURSE MONTAYRE breached his respective duties by failing to recommend that HANNA receive laboratory and/or diagnostic examinations performed to aid in the diagnoses and/or treatment of his condition.

575.    At all times material, the care provided to HANNA by NURSE MONTAYRE was not that of a reasonably prudent, similar health care provider.

576. At all times material, it was foreseeable to NURSE MONTAYRE that failure to render health services to residents of the Manatee County Jail, including HANNA, in a manner consistent with that of a reasonably prudent, similar health care provider would result in injuries and damages.

577. As a direct and proximate cause of NURSE MONTAYRE's medical negligence, HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and has been rendered into a persistent vegetative state.

578. A further direct and proximate cause of NURSE MONTAYRE's medical negligence was that HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

579. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE MONTAYRE for compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

## COUNT XVI – DELIBERATE INDIFFERENCE
*(As to Defendant, Nurse Bernard Montayre, only)*

580. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

581. The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

582. At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including

HANNA.

583.    At all times material, ARMOR was required to train its own employees in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

584.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

585.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

586.    As such, at all times material, ARMOR and its employees, including NURSE MONTAYRE, were acting under the color of state law.

587.    At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

588.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

589.    As part of the terms of the Original Agreement and its six Amendments, ARMOR

was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital. For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

590. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

591. At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

592. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

593. Based on information and belief, prior to and throughout HANNA's detention in

the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

594. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

595. NURSE MONTAYRE had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

596. At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services, and NURSE MONTAYRE knew of this.

597. At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA, and NURSE MONTAYRE knew this and acted consistently therewith.

598. ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services, and NURSE MONTAYRE knew this and acted consistently therewith.

599. The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that NURSE MONTAYRE knew of and exhibited a deliberate indifference to.

600. On or about August 23, 2017, HANNA lost consciousness in the exercise yard at the Manatee County Jail, complained of headaches; NURSE POLANCO responded and was told by other residents that HANNA had a seizure, and later viewed video surveillance of the incident confirming that HANNA did, in fact, faint and fall to the ground, hit his head, and remain on the ground for approximately 41 seconds.

601. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have certain laboratory and/or diagnostic evaluations to further aid in diagnosing and rendering adequate health care to his condition, and also to prevent a worsening of his condition, and was deliberately indifferent to those needs.

602. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be evaluated by a physician and was deliberately indifferent to those needs.

603. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed emergency, ambulance, and/or urgent care to an outside facility beyond Manatee County Jail because the medical staff and/or equipment in the Manatee County Jail was inadequate to reasonably care for HANNA and was deliberately indifferent to those needs.

604. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be monitored for an extended period of time and not released back to his cell where he would reside by himself and was deliberately indifferent to those needs.

605. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have a follow-up evaluation with a physician and was deliberately indifferent to those needs.

606.     At all times material, NURSE MONTAYRE had actual or constructive knowledge of the averments previously plead herein.

607.     On or about September 8, 2017, a "med stat" was called over the radio in the Manatee County Jail and NURSE MONTAYRE responded to Cell 19 where HANNA was housed.

608.     NURSE MONTAYRE had actual or constructive knowledge that, prior to the "med stat" call on September 8, 2017, Deputy Geis of MCSO saw HANNA on the floor of his cell, asked him if he was alright, HANNA stood up and said he felt light headed, then HANNA fainted again.

609.     After performing a cursory evaluation of HANNA on September 8, 2017, NURSE MONTAYRE, knowing of HANNA's serious needs for urgent, ambulatory, specialty, diagnostic, and/or emergency care, left the cell and took no further action to care for HANNA.

610.     On or about September 8, 2017, NURSE MONTAYRE was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, and/or failing to transport to a hospital.

611.     Following September 9, 2017, after HANNA returned to Manatee Memorial Jail from a local hospital, NURSE MONTAYRE knew that ARMOR and MCSO did not maintain adequate staff and/or medical equipment in the Manatee County Jail to render adequate medical care to HANNA, who had serious conditions including being in a persistent vegetative state, and was deliberately indifferent to those needs and conditions.

612.     As a direct and proximate cause of NURSE MONTAYRE's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish,

emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

613. NURSE MONTAYRE's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

614. NURSE MONTAYRE's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

615. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

616. PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE MONTAYRE for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

## COUNT XVII – MEDICAL NEGLIGENCE
*(As to Defendant, Nurse Paula Sanders, only)*

617. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

618. At all times material, NURSE SANDERS was a health care provider as defined by Section 766.202, Florida Statutes.

619. At all times material, NURSE SANDERS was an employee or agent of ARMOR.

620. At all times material, NURSE SANDERS worked in the Manatee County Jail.

621. At all times material, NURSE SANDERS had a duty to act within the prevailing professional standard of care for their respective types of health care providers, which was a level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably prudent similar health care providers.

622. NURSE SANDERS's afore-stated duties extended to residents of the Manatee County Jail, including HANNA, for whom she provided health care and services.

623. At all times material, NURSE SANDERS breached her respective duties by failing to recognize the presentation of serious signs and symptoms that required urgent and emergent referral to different health care providers, urgent care, and/or emergency care for further work-up and evaluation, and by failing to ensure that HANNA was referred to urgent and/or emergent health care facilities for further work-up and evaluation.

624. At all times material, NURSE SANDERS breached her respective duties by failing to recommend that HANNA receive laboratory and/or diagnostic examinations performed to aid in the diagnoses and/or treatment of his condition.

625. At all times material, the care provided to HANNA by NURSE SANDERS was not that of a reasonably prudent, similar health care provider.

626. At all times material, it was foreseeable to NURSE SANDERS that failure to render health services to residents of the Manatee County Jail, including HANNA, in a manner consistent with that of a reasonably prudent, similar health care provider would result in injuries and damages.

627. As a direct and proximate cause of NURSE SANDERS's medical negligence, HANNA was seriously injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and has been rendered into a persistent vegetative state.

628. A further direct and proximate cause of NURSE SANDERS's medical negligence was that HANNA incurred past and future medical expenses, transportation and relocation costs, lost wages, and lost his future earning capacity.

629. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE SANDERS for

compensatory damages, reserves the right to seek leave for punitive damages in the future, and asks for any other relief this Court deems proper.

<u>C</u>OUNT <u>XVIII</u> – <u>D</u>ELIBERATE <u>I</u>NDIFFERENCE
*(As to Defendant, Nurse Paula Sanders, only)*

630.    PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

631.    The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

632.    At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

633.    At all times material, ARMOR was required to train its own employees in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

634.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

635.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

636.    As such, at all times material, ARMOR and its employees, including NURSE

SANDERS, were acting under the color of state law.

637.    At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

638.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

639.    As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital.  For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

640.    As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

641.    At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive

timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

642. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

643. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

644. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

645. NURSE SANDERS had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

646.     At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services, and NURSE SANDERS knew of this.

647.     At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA, and NURSE SANDERS knew this and acted consistently therewith.

648.     ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services, and NURSE SANDERS knew this and acted consistently therewith.

649.     The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that NURSE SANDERS knew of and exhibited a deliberate indifference to.

650.     On or about August 23, 2017, HANNA lost consciousness in the exercise yard at the Manatee County Jail, complained of headaches; NURSE POLANCO responded and was told by other residents that HANNA had a seizure, and later viewed video surveillance of the incident confirming that HANNA did, in fact, faint and fall to the ground, hit his head, and remain on the ground for approximately 41 seconds.

651.     On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have certain laboratory and/or diagnostic evaluations to further aid in diagnosing and rendering adequate health care to his condition, and also to prevent a worsening of his condition, and was deliberately indifferent to those needs.

652.     On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be evaluated by a physician and was deliberately indifferent to those needs.

653.     On or about August 23, 2017, NURSE POLANCO knew that HANNA needed emergency, ambulance, and/or urgent care to an outside facility beyond Manatee County Jail because the medical staff and/or equipment in the Manatee County Jail was inadequate to reasonably care for HANNA and was deliberately indifferent to those needs.

654.     On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be monitored for an extended period of time and not released back to his cell where he would reside by himself and was deliberately indifferent to those needs.

655.     On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have a follow-up evaluation with a physician and was deliberately indifferent to those needs.

656.     On or about September 8, 2017, a "med stat" was called over the radio in the Manatee County Jail and NURSE MONTAYRE and NURSE OGLINE responded to Cell 19 where HANNA was housed.

657.     NURSE MONTAYRE and NURSE OGLINE had actual or constructive knowledge that, prior to the "med stat" call on September 8, 2017, Deputy Geis of MCSO saw HANNA on the floor of his cell, asked him if he was alright, HANNA stood up and said he felt light headed, then HANNA fainted again.

658.     After performing a cursory evaluation of HANNA on September 8, 2017, NURSE MONTAYRE, knowing of HANNA's serious needs for urgent, ambulatory, specialty, diagnostic, and/or emergency care, left the cell and took no further action to care for HANNA, and NURSE OGLINE did not order a follow up with a doctor, did not activate emergency, specialty, diagnostic, urgent, or emergency care, and permitted HANNA to return to his cell.

659.     On or about September 9, 2017, HANNA was found unresponsive in his cell and

has never regained consciousness.

660. Following September 9, 2017, after HANNA returned to the Manatee County Jail from the hospital, NURSE SANDERS had actual or constructive knowledge that ARMOR and MCSO did not have the staff and equipment necessary to render adequate aid to HANNA and his serious medical needs, as he was in a persistent vegetative state, and remained deliberately indifferent to those needs and conditions.

661. At all times material, NURSE SANDERS had actual or constructive knowledge of the incidents involving HANNA that occurred between August 23, 2017 and September 9, 2017.

662. Following September 9, 2017, after HANNA returned to Manatee Memorial Jail from a local hospital, NURSE SANDERS knew that ARMOR and MCSO did not maintain adequate staff and/or medical equipment in the Manatee County Jail to render adequate medical care to HANNA, who had serious conditions including being in a persistent vegetative state, and was deliberately indifferent to those needs and conditions.

663. NURSE SANDERS was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, and/or failing to transport to a hospital.

664. As a direct and proximate cause of NURSE SANDERS' deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

665. NURSE SANDERS' deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

666. NURSE SANDERS' deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

667. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

668. PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE SANDERS for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

### COUNT XIX – DELIBERATE INDIFFERENCE
*(As to Defendant, Nurse Rose Marie Grether, only)*

669. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

670. The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

671. At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

672. At all times material, ARMOR was required to train its own employees in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

673. At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

674. At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

675. As such, at all times material, ARMOR and its employees, including NURSE R. GRETHER, were acting under the color of state law.

676. At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

677. At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

678. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital. For each contract year, ARMOR was financially responsible for the first

$40,000.00 USD of those transportation costs.

679. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

680. At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

681. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

682. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's

medical needs.

683.     Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

684.     NURSE R. GRETHER had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

685.     At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services, and NURSE R. GRETHER knew of this.

686.     At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA, and NURSE R. GRETHER knew this and acted consistently therewith.

687.     ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services, and NURSE R. GRETHER knew this and acted consistently therewith.

688.     The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that NURSE R. GRETHER knew of and exhibited a deliberate indifference to.

689.    On or about August 23, 2017, HANNA lost consciousness in the exercise yard at the Manatee County Jail, complained of headaches; NURSE POLANCO responded and was told by other residents that HANNA had a seizure, and later viewed video surveillance of the incident confirming that HANNA did, in fact, faint and fall to the ground, hit his head, and remain on the ground for approximately 41 seconds.

690.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have certain laboratory and/or diagnostic evaluations to further aid in diagnosing and rendering adequate health care to his condition, and also to prevent a worsening of his condition, and was deliberately indifferent to those needs.

691.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be evaluated by a physician and was deliberately indifferent to those needs.

692.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed emergency, ambulance, and/or urgent care to an outside facility beyond Manatee County Jail because the medical staff and/or equipment in the Manatee County Jail was inadequate to reasonably care for HANNA and was deliberately indifferent to those needs.

693.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be monitored for an extended period of time and not released back to his cell where he would reside by himself and was deliberately indifferent to those needs.

694.    On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have a follow-up evaluation with a physician and was deliberately indifferent to those needs.

695.    On or about September 8, 2017, a "med stat" was called over the radio in the Manatee County Jail and NURSE OGLINE and NURSE MONTAYRE responded to Cell 19 where HANNA was housed.

696.    NURSE OGLINE and/or NURSE MONTAYRE had actual or constructive

knowledge that, prior to the "med stat" call on September 8, 2017, Deputy Geis of MCSO saw HANNA on the floor of his cell, asked him if he was alright, HANNA stood up and said he felt light headed, then HANNA fainted again.

697.    After performing a cursory evaluation of HANNA on September 8, 2017, NURSE OGLINE, knowing of HANNA's serious needs for urgent, ambulatory, specialty, diagnostic, and/or emergency care allowed HANNA to be returned to his cell alone.

698.    On or about September 8, 2017, NURSE OGLINE was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, and/or failing to transport to a hospital.

699.    At all times material, NURSE R. GRETHER had actual or constructive knowledge of the preceding averments in this count.

700.    On or about September 9, 2017, a "med stat" was called in the Manatee County Jail and NURSE R. GRETHER responded to Cell 19 where HANNA was housed.

701.    NURSE R. GRETHER had actual or constructive knowledge that, prior to the "med stat" on September 9, 2017, HANNA was found unresponsive on the floor in his cell.

702.    On or about September 9, 2017, NURSE R. GRETHER was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to timely render adequate treatment, allowing CPR to be performed by uncertified MCSO employee(s), failing to timely refer to a doctor, failing to timely run diagnostic testing, failing to timely activate EMS, failing to timely activate 911, failing to timely request ambulatory services, failing to timely arrange specialty care, failing to timely arrange transport to

an urgent care, failing to timely arrange transport to an emergency room, and/or failing to timely transport to a hospital.

703.     Following September 9, 2017, after HANNA returned to Manatee Memorial Jail from a local hospital, NURSE R. GRETHER knew that ARMOR and MCSO did not maintain adequate staff and/or medical equipment in the Manatee County Jail to render adequate medical care to HANNA, who had serious conditions including being in a persistent vegetative state, and was deliberately indifferent to those needs and conditions.

704.     As a direct and proximate cause of NURSE R. GRETHER's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

705.     NURSE R. GRETHER's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

706.     NURSE R. GRETHER's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

707.     The PLAINTIFF requests a trial by jury on all issues so triable in this count.

708.     PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE R. GRETHER for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

709.     PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

710.     The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

711.     At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

712.     At all times material, ARMOR was required to train its own employees in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

713.     At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

714.     At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

715.     As such, at all times material, ARMOR and its employees, including NURSE D. GRETHER, were acting under the color of state law.

716.     At all times material, HANNA was deprived of rights (to wit: sufficient and

adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

717.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

718.    As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital.  For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

719.    As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

720.    At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the

Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

721. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

722. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

723. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

724. NURSE D. GRETHER had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

725. At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including

HANNA, with ambulatory, emergency, specialty, and/or off-site medical services, and NURSE R. GRETHER knew of this.

726. At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA, and NURSE D. GRETHER knew this and acted consistently therewith.

727. ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services, and NURSE D. GRETHER knew this and acted consistently therewith.

728. The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that NURSE D. GRETHER knew of and exhibited a deliberate indifference to.

729. On or about August 23, 2017, HANNA lost consciousness in the exercise yard at the Manatee County Jail, complained of headaches; NURSE POLANCO responded and was told by other residents that HANNA had a seizure, and later viewed video surveillance of the incident confirming that HANNA did, in fact, faint and fall to the ground, hit his head, and remain on the ground for approximately 41 seconds.

730. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have certain laboratory and/or diagnostic evaluations to further aid in diagnosing and rendering adequate health care to his condition, and also to prevent a worsening of his condition, and was deliberately indifferent to those needs.

731. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be evaluated by a physician and was deliberately indifferent to those needs.

732. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed emergency, ambulance, and/or urgent care to an outside facility beyond Manatee County Jail because the medical staff and/or equipment in the Manatee County Jail was inadequate to reasonably care for HANNA and was deliberately indifferent to those needs.

733. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be monitored for an extended period of time and not released back to his cell where he would reside by himself and was deliberately indifferent to those needs.

734. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have a follow-up evaluation with a physician and was deliberately indifferent to those needs.

735. On or about September 8, 2017, a "med stat" was called over the radio in the Manatee County Jail and NURSE OGLINE and NURSE MONTAYRE responded to Cell 19 where HANNA was housed.

736. NURSE OGLINE and NURSE MONTAYRE had actual or constructive knowledge that, prior to the "med stat" call on September 8, 2017, Deputy Geis of MCSO saw HANNA on the floor of his cell, asked him if he was alright, HANNA stood up and said he felt light headed, then HANNA fainted again.

737. After performing a cursory evaluation of HANNA on September 8, 2017, NURSE OGLINE, knowing of HANNA's serious needs for urgent, ambulatory, specialty, diagnostic, and/or emergency care allowed HANNA to be returned to his cell alone.

738. On or about September 8, 2017, NURSE OGLINE and/or NURSE MONTAYRE were deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent

care, failing to transport to an emergency room, and/or failing to transport to a hospital.

739.    At all times material, NURSE D. GRETHER had actual or constructive knowledge of the preceding averments in this count.

740.    On or about September 9, 2017, a "med stat" was called in the Manatee County Jail and NURSE R. GRETHER responded to Cell 19 where HANNA was housed.

741.    NURSE D. GRETHER had actual or constructive knowledge that, prior to the "med stat" on September 9, 2017, HANNA was found unresponsive on the floor in his cell.

742.    On or about September 9, 2017, NURSE D. GRETHER was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to timely render adequate treatment, allowing CPR to be performed by uncertified MCSO employee(s), failing to timely refer to a doctor, failing to timely run diagnostic testing, failing to timely activate EMS, failing to timely activate 911, failing to timely request ambulatory services, failing to timely arrange specialty care, failing to timely arrange transport to an urgent care, failing to timely arrange transport to an emergency room, and/or failing to timely transport to a hospital.

743.    Following September 9, 2017, after HANNA returned to Manatee Memorial Jail from a local hospital, NURSE D. GRETHER knew that ARMOR and MCSO did not maintain adequate staff and/or medical equipment in the Manatee County Jail to render adequate medical care to HANNA, who had serious conditions including being in a persistent vegetative state, and was deliberately indifferent to those needs and conditions.

744.    As a direct and proximate cause of NURSE D. GRETHER's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative

state.

745. NURSE D. GRETHER's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

746. NURSE D. GRETHER's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

747. The PLAINTIFF requests a trial by jury on all issues so triable in this count.

748. PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against NURSE D. GRETHER for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

## COUNT XXI – DELIBERATE INDIFFERENCE
### *(As to Defendant, Doctor Elvira Perez, only)*

749. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-193.

750. The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

751. At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

752. At all times material, ARMOR was required to train its own employees in topics related to the provision of health care and services to residents of the Manatee County Jail,

including HANNA.

753.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

754.    At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

755.    As such, at all times material, ARMOR and its employees, including DOCTOR PEREZ, were acting under the color of state law.

756.    At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

757.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

758.    As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical

care facility or hospital. For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

759. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

760. At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

761. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

762. Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such

services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

763.    Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

764.    DOCTOR PEREZ had actual or constructive knowledge of the longstanding and widespread practices referenced herein.

765.    At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services, and DOCTOR PEREZ knew of this.

766.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA, and DOCTOR PEREZ knew this and acted consistently therewith.

767.    ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services, and DOCTOR PEREZ knew this and acted consistently therewith.

768.    The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that DOCTOR PEREZ knew of and

exhibited a deliberate indifference to.

769. On or about August 23, 2017, HANNA lost consciousness in the exercise yard at the Manatee County Jail, complained of headaches; NURSE POLANCO responded and was told by other residents that HANNA had a seizure, and later viewed video surveillance of the incident confirming that HANNA did, in fact, faint and fall to the ground, hit his head, and remain on the ground for approximately 41 seconds.

770. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have certain laboratory and/or diagnostic evaluations to further aid in diagnosing and rendering adequate health care to his condition, and also to prevent a worsening of his condition, and was deliberately indifferent to those needs.

771. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be evaluated by a physician and was deliberately indifferent to those needs.

772. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed emergency, ambulance, and/or urgent care to an outside facility beyond Manatee County Jail because the medical staff and/or equipment in the Manatee County Jail was inadequate to reasonably care for HANNA and was deliberately indifferent to those needs.

773. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to be monitored for an extended period of time and not released back to his cell where he would reside by himself and was deliberately indifferent to those needs.

774. On or about August 23, 2017, NURSE POLANCO knew that HANNA needed to have a follow-up evaluation with a physician and was deliberately indifferent to those needs.

775. On or about September 8, 2017, a "med stat" was called over the radio in the Manatee County Jail and NURSE OGLINE and NURSE MONTAYRE responded to Cell 19 where HANNA was housed.

776. NURSE OGLINE and NURSE MONTAYRE had actual or constructive knowledge that, prior to the "med stat" call on September 8, 2017, Deputy Geis of MCSO saw HANNA on the floor of his cell, asked him if he was alright, HANNA stood up and said he felt light headed, then HANNA fainted again.

777. After performing a cursory evaluation of HANNA on September 8, 2017, NURSE OGLINE, knowing of HANNA's serious needs for urgent, ambulatory, specialty, diagnostic, and/or emergency care allowed HANNA to be returned to his cell alone.

778. On or about September 8, 2017, NURSE OGLINE and/or NURSE MONTAYRE was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to refer to a doctor, failing to order a follow-up assessment, failing to run diagnostic testing, failing to activate EMS, failing to activate 911, failing to request ambulatory services, failing to arrange specialty care, failing to transport to an urgent care, failing to transport to an emergency room, and/or failing to transport to a hospital.

779. On or about September 9, 2017, a "med stat" was called in the Manatee County Jail and NURSE OGLINE and either NURSE R. GRETHER or NURSE D. GRETHER responded to Cell 19 where HANNA was housed.

780. NURSE OGLINE and either NURSE R. GRETHER or NURSE D. GRETHER had actual or constructive knowledge that, prior to the "med stat" on September 9, 2017, HANNA was found unresponsive on the floor in his cell.

781. At all times material, DOCTOR PEREZ had actual or constructive knowledge of the preceding averments in this count.

782. At all times material, DOCTOR PEREZ was a superior to the ARMOR nurses in the Manatee County Jail; stated another way, nurses were subordinate to DOCTOR PEREZ.

783. Following September 9, 2017, after HANNA returned to Manatee Memorial Jail

from a local hospital, DOCTOR PEREZ knew that ARMOR and MCSO did not maintain adequate staff and/or medical equipment in the Manatee County Jail to render adequate medical care to HANNA, who had serious conditions including being in a persistent vegetative state, and was deliberately indifferent to those needs and conditions.

784.    At all times material, DOCTOR PEREZ was deliberately indifferent to HANNA's serious medical needs by, *inter alia*, failing to diagnose, failing to render adequate treatment, failing to timely render adequate treatment, allowing CPR to be performed by uncertified MCSO employee(s), failing to timely refer to another doctor, failing to timely run diagnostic testing, failing to timely activate EMS, failing to timely activate 911, failing to timely request ambulatory services, failing to timely arrange specialty care, failing to timely arrange transport to an urgent care, failing to timely arrange transport to an emergency room, and/or failing to timely transport to a hospital.

785.    As a direct and proximate cause of DOCTOR PEREZ's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

786.    DOCTOR PEREZ's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

787.    DOCTOR PEREZ's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

788.    The PLAINTIFF requests a trial by jury on all issues so triable in this count.

789.    PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful

prosecution of this claim pursuant to 42 U.S.C. § 1988.

WHEREFORE the PLAINTIFF hereby demands judgment against DOCTOR PEREZ for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

### COUNT XXII – NEGLIGENCE
*(As to Defendant, Sgt. Ronald Laughlin, only)*

790.    PLAINTIFF hereby reavers and incorporates paragraphs 1-193 as if stated fully herein.

791.    At all times material, SGT. LAUGHLIN was an employee of MCSO and worked in the Manatee County Jail.

792.    At all times material, SGT. LAUGHLIN owed a duty to residents of the Manatee County Jail, including HANNA, to exercise reasonable care in the performance of his job for MCSO.

793.    It was reasonably foreseeable that a breach of SGT. LAUGHLIN's duties would place residents of the Manatee County Jail, including HANNA, at risk of being injured, damaged, or otherwise harmed.

794.    SGT. LAUGHLIN received training on responding to medical emergencies as well as other aspects of health care services in the jail by ARMOR.

795.    On or about August 23, 2017, HANNA fainted in the exercise yard in the Manatee County Jail.

796.    On or about August 23, 2017, SGT. LAUGHLIN was notified of the incident by Deputy McGuire of MCSO.

797.    On or about August 23, 2017, SGT. LAUGHLIN was notified of the incident and some preliminary findings and/or belief of NURSE POLANCO.

798.    At all times material, SGT. LAUGHLIN was asked to que of the video footage

from the H/SW exercise yard where HANNA collapsed.

799.    SGT. LAUGHLIN knew, in review of that video footage, that HANNA collapsed on the exercise yard and hit his head at 11:55:19 and was on the ground until 11:56:00.

800.    At all times material, SGT. LAUGHLIN breached his afore-stated duties by failing to activate emergency services, request fire rescue, request EMS, request an ambulance, call 911, notify a physician, arrange for transport to an urgent care or hospital, and/or take reasonable steps to make sure that HANNA received proper medical care by ARMOR employees or anyone else after seeing HANNA collapsed for 41 seconds.

801.    As a direct and proximate cause of SGT. LAUGHLIN's negligence, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

802.    SGT. LAUGHLIN's negligence was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

803.    PLAINTIFF requests a jury trial on all issues so triable.

WHEREFORE the PLAINTIFF hereby demands judgment against SGT. LAUGHLIN for compensatory damages and asks for any other relief this Court deems proper.

## COUNT XXIII – DELIBERATE INDIFFERENCE
*(As to Defendant, Sgt. Ronald Laughlin, only)*

804.    PLAINTIFF reavers and incorporates by reference paragraphs 1-193 and 790-798 as if fully stated herein.

805.    The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

806. At all times material, SGT. LAUGHLIN was a state actor.

807. On or about August 23, 2017, knew HANNA had serious medical needs given that he had seen, on video, HANNA collapse in the exercise yard and remain on the ground for approximately 41 seconds.

808. At all times material, SGT. LAUGHLIN was deliberately indifferent to HANNA's serious medical needs by failing to activate emergency services, request fire rescue, request EMS, request an ambulance, call 911, notify a physician, arrange for transport to an urgent care or hospital, and/or take reasonable steps to make sure that HANNA received proper medical care by ARMOR employees or anyone else after seeing HANNA collapsed for 41 seconds.

809. As a direct and proximate cause of SGT. LAUGHLIN's deliberate indifference to HANNA's serious medical needs, HANNA was injured and suffered adverse, permanent health consequences such as headaches, syncopal episodes, irritation, pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and is now in a persistent vegetative state.

810. SGT. LAUGHLIN's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, and loss of future earning capacity.

811. SGT. LAUGHLIN's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

812. PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

813. PLAINTIFF requests a jury trial on all issues so triable.

WHEREFORE the PLAINTIFF hereby demands judgment against SGT. LAUGHLIN for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court

deems proper.

<u>**COUNT XXIV – DELIBERATE INDIFFERENCE TO KEEP HANNA IN JAIL**</u>
*(As to Defendant, Armor Correctional Health Services, Inc., only)*

814. PLAINTIFF hereby incorporates by reference the averments found in preceding paragraphs 1-208.

815. The provision of health care and services to pretrial detainees within a State or municipality's jail or correctional facility, such as HANNA within the Manatee County Jail, is a governmental act.

816. At all times material, by virtue of the Original Agreement and its six Amendments, MCSO and COUNTY regulated and substantially funded ARMOR to perform the governmental act of providing health care services to pretrial detainees within the Manatee County Jail, including HANNA.

817. At all times material, ARMOR was required to train its own employees and MCSO correctional officers in topics related to the provision of health care and services to residents of the Manatee County Jail, including HANNA.

818. At all times material, ARMOR and its employees and MCSO and COUNTY and its employees worked in concert and jointly participated in the enterprise of operating the Manatee County Jail and providing health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

819. At all times material, ARMOR and its employees and MCSO and COUNTY and its employees closely cooperated and coordinated their respective efforts to operate the Manatee County Jail and provide health care and services to pretrial detainees within the Manatee County Jail, including HANNA.

820. As such, at all times material, ARMOR and its employees and agents, including, but not limited to, retained counsel, were acting under the color of state law.

821. At all times material, HANNA was deprived of rights (to wit: sufficient and adequate health care as a pretrial detainee) secured by the Constitution or laws of the United States, including, but not limited to, the Fourteenth Amendment to the United States Constitution and Title 42 of the United States Code.

822. At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR received millions of dollars in taxpayer money from MCSO and COUNTY to provide "all medical, dental, mental health, substance abuse and other related health care services," excluding non-emergency transportation by EMS, to residents of the Manatee County Jail, including pretrial detainees such as HANNA.

823. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, financially responsible for actual costs associated with "outside services," as defined Paragraph 3B(1) of the Original Agreement and Paragraph 163 herein, up to $750,000.00 USD per contract year. If outside service costs exceeded $750,000.00 USD but were equal to or less than $950,000.00 USD, ARMOR was responsible for 50% of those actual costs.

824. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to provide all necessary emergency medical care and treatment 24 hours per day, 7 days per week to the residents at the Manatee County Jail, including HANNA, to be performed either on-site where the person was housed or at an emergency medical care facility or hospital. For each contract year, ARMOR was financially responsible for the first $40,000.00 USD of those transportation costs.

825. As part of the terms of the Original Agreement and its six Amendments, ARMOR was, at all times material, responsible to arrange for the admission of any resident of the Manatee County Jail who required hospitalization, including HANNA, and be fully responsible for any and all costs or expenses incurred thereof.

826.     At all times material, by virtue of its own policies, ARMOR had a duty to, *inter alia*, give residents of the Manatee County Jail, including HANNA, access to care; prohibit unreasonable barriers to care; receive care based on need, without regard to financial status; receive equal access to health services even if, as a result of some condition, they could not speak; receive timely laboratory and diagnostic services; have access to hospitalization and/or specialty care; be brought to a community hospital if health care needs were beyond the resources available in the Manatee County Jail; if suffering from a life-threatening condition, to have EMS and 911 activated immediately; and receive medically necessary care.

827.     Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to transport residents at jails and prisons in need of outside medical services to outside facilities such as urgent cares, emergency rooms, and hospitals; or, if transporting such residents to outside facilities, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

828.     Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to activate EMS and/or 911 and/or Fire Rescue and/or ambulance services for the benefit of residents at jails and prisons in need; or, if activating such services, it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

829.     Based on information and belief, prior to and throughout HANNA's detention in the Manatee County Jail, ARMOR had a longstanding and widespread (that is, not just limited to Manatee County, Florida) practice of failing to provide or arrange for specialty medical services for the benefit of residents at jails and prisons in need; or, if providing or arranging such services,

it was not done within a reasonable time or with deliberate indifference to the resident's medical needs.

830.    ARMOR had actual or constructive knowledge of the longstanding and widespread practices referenced herein and failed to take action to stop it.

831.    At all times material, ARMOR, a for-profit corporation, had a clear financial incentive to delay or outright fail to provide residents at the Manatee County Jail, including HANNA, with ambulatory, emergency, specialty, and/or off-site medical services.

832.    At all times material, by virtue of the Original Agreement and its six Amendments, ARMOR was inherently dissuaded from making objective, accurate medical decisions for residents at the Manatee County Jail, including HANNA.

833.    ARMOR was financially motivated to intentionally delay providing ambulatory, emergency, specialty, and/or off-site medical services.

834.    The considerations set forth in this count placed residents at the Manatee County Jail, including HANNA, at risk of not receiving the ambulatory, emergency, specialty, and/or off-site medical services they needed; serious medical needs that ARMOR knew of and exhibited a deliberate indifference to.

835.    After HANNA returned to the Manatee County Jail following his September 9, 2017 hospitalization in a persistent vegetative state, ARMOR violated the terms of its own policies, including, but not limited to:

    a.    J-A-01 which called for care to be provided in a timely manner and without presenting unreasonable barriers;

    b.    J-A-01.2 which called for residents such as HANNA with limited English proficiency to be cared for appropriately under the circumstances, including efforts to contact a legal guardian, attorney, or next-of-kin;

c.　　J-A-08 which called for communication about those residents such as HANNA who had special needs due to medical conditions;

d.　　J-A-10.1 which defined morbidity and sentinel events and set forth steps to respond, monitor, report, and review them;

e.　　J-A-10.2 which addressed adverse clinical events and set forth steps to respond, monitor, report, and review them;

f.　　J-D-04 which called for residents such as HANNA to have timely access to diagnostics;

g.　　J-D-03 which addressed the equipment to be maintained at the Manatee County Jail, which was clearly inadequate to care for HANNA in light of his serious medical needs that ARMOR knew about;

h.　　J-D-05 which contemplated hospitalization or provision of specialty care;

i.　　J-G-03.1 which made clear that the medical housing unit where ARMOR housed HANNA at all times material was not to be used for those who needed 24 hour care, such as HANNA, as those residents should be transferred to a nearby hospital or outside facility;

j.　　ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively Impaired," as applicable to the Manatee County Jail at all times material, contemplated advocacy for those patients who could not make sound decisions regarding his or her medical care likely due to the very illness or condition in need of treatment.  That policy contemplated efforts to contact a patient's next of kind, lawyer, encouraged ARMOR's client to seek assistance from the presiding or probate court system, the State's Attorney, or for ARMOR staff to try to contact any other concerned and interested party that may offer help for the patient.

k.　　ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively Impaired" further acknowledged that advocacy for those patients "is a

daily process that must continue until a safe resolution is found for the patient."

l. In the context of ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively Impaired," the term "Advocacy" was defined as "[ARMOR]'s support, care, and/or the appropriate health care facility placement for [its] patients. If necessary [ARMOR's] advocacy will include the pleading for help from any and all appropriate, interested parties.

m. ARMOR's Policy titled "Advocacy for the Mentally Incompetent/Cognitively Impaired" contemplates that all efforts to communicate a patient's needs and find help will be documented on form MH-028, which must be entered into the patient's medical record.

836. At all times material, efforts were made on HANNA's behalf in his criminal case in Circuit Court, Manatee County, Florida (2018-CA-2459) ("Criminal Case") to obtain his release on his own recognizance or a reasonable monetary bond with reasonable non-monetary conditions in light of HANNA's medical condition. Specifically, efforts were made to have HANNA released from the Manatee County Jail to a nearby hospital due to his serious medical needs.

837. Although ARMOR was not a party to the Criminal Case, it retained private counsel (to wit: Eric Netcher, Esq. and S. Renee Lundy, Esq.) who intervened in the Criminal Case's matter of HANNA's pretrial release status.

838. ARMOR's involvement in the Criminal Case was that of presenting unreasonable barriers to HANNA getting the care he needed for his serious medical conditions, refusing to provide transportation to a nearby hospital, and otherwise taking positions that lent themselves to having HANNA remain in ARMOR's care and MCSO's custody in the Manatee County Jail despite knowing of HANNA's serious medical needs and that hospitalization was needed instead of housing him in the jail.

839.     ARMOR's involvement in the Criminal Case was inapposite to its advocacy policy for the mentally incompetent, and several other policies as outlined in this count.

840.     ARMOR's involvement in the Criminal Case was done with the intent to keep HANNA in the Manatee County Jail where ARMOR knew it did not have adequate staffing and equipment needs to care for HANNA.

841.     ARMOR's involvement in the Criminal Case was done with a financial incentive as well, because ARMOR was financially responsible for a portion of any of HANNA's hospitalization costs, which previously had been in the hundreds of thousands.

842.     ARMOR's involvement in the Criminal Case was further done with a financial incentive in the hopes that, while still in the Manatee County Jail, HANNA would die and thereby any future claims for money damages against ARMOR would be reduced or otherwise mitigated.

843.     As a direct and proximate cause of ARMOR's deliberate indifference to HANNA's serious medical needs, HANNA was housed and cared for in the Manatee County Jail instead of an outside facility, further injured, and suffered unnecessary pain and suffering, mental anguish, emotional distress, inconvenience, loss for enjoyment of life, and remained in a persistent vegetative state.

844.     ARMOR's deliberate indifference was also a direct and proximate cause of HANNA incurring past and future medical expenses, transportation and relocation costs, lost wages, loss of future earning capacity, and not getting proper medical treatment he needed while in a persistent vegetative state.

845.     ARMOR's deliberate indifference was a violation of HANNA's clearly-established federal constitutional rights for which 42 U.S.C. § 1983 provides a remedy.

846.     PLAINTIFF is entitled to recover reasonable attorneys' fees for the successful prosecution of this claim pursuant to 42 U.S.C. § 1988.

847.    PLAINTIFF requests a jury trial on all issues so triable.

WHEREFORE the PLAINTIFF hereby demands judgment against ARMOR for compensatory damages, punitive damages, attorneys' fees, and asks for any other relief this Court deems proper.

RESPECTFULLY SUBMITTED BY:

**FISCHER REDAVID PLLC**
4601 Sheridan Street
Suite 320
Hollywood, FL 33021
Telephone: (954) 860-8434
Facsimile: (954) 860-8584
Service@FRTrialLawyers.com (eService Only)
Litigation@FRTrialLawyers.com (Correspondence)

BY: */S/ JORDAN REDAVID, ESQ.*
    **JORDAN REDAVID, ESQ.**
    Florida Bar No. 109227
    *Lead Counsel for Plaintiff*
    **JOHN P. FISCHER, ESQ.**
    Florida Bar No. 99751
    *Co-Counsel for Plaintiff*