# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PATRICIA HANNAH, as Plenary Legal
Guardian of Darryl Vaughn Hanna, Jr.,

      Plaintiff,

v.                                                          Case No: 8:19-cv-596-T-30SPF

ARMOR CORRECTIONAL HEALTH
SERVICES, INC., MANATEE COUNTY,
FLORIDA, RICK WELLS, in his official
capacity as Sheriff of the Manatee County
Sheriff's Office, LEILA POLANCO,
CARMA OGLINE, BERNARD
MONTAYRE, PAULA SANDERS,
ELVIRA PEREZ, RONALD LAUGHLIN,

      Defendants.

_____

## ORDER

THIS CAUSE comes before the Court upon four separate motions to dismiss: Defendant Rick Wells' Motion to Dismiss (Dkt. 43), Defendant Ronald Laughlin's Motion to Dismiss (Dkt. 44), Armor Defendants' Joint Motion to Dismiss (Dkt. 45), and Defendant Manatee County's Motion to Dismiss (Dkt. 48). The Court has carefully reviewed these motions and Plaintiff's responses in opposition (Dkts. 46, 47, 53, and 54). The Court has also reviewed in great detail the lengthy amended complaint (Dkt. 40). As explained further below, the Court concludes that Defendant Rick Wells' Motion to Dismiss (Dkt. 43) is granted in part and denied in part, Defendant Ronald Laughlin's Motion to Dismiss (Dkt. 44) is denied, Armor Defendants' Joint Motion to Dismiss (Dkt.

45) is granted in part and denied in part, and Defendant Manatee County's Motion to Dismiss (Dkt. 48) is denied. Specifically, all legal claims will remain except for the following: Counts VI, IX, XVIII, XIX, and XX.

## BACKGROUND

The allegations of the amended complaint (Dkt. 40) are undeniably tragic. Plaintiff Patricia Hanna is the plenary guardian for Darryl Vaughn Hanna, Jr. ("Hanna"), who is in a persistent vegetative state after suffering four syncopal episodes while he was detained at the Manatee County Jail. The amended complaint alleges the following facts that led to Hanna's condition. The Court must assume the truth of these allegations.

The Manatee County Jail is a correctional facility intended to detain people who are accused of violating Florida's criminal laws within Manatee County, Florida. On or about August 9, 2017, Hanna was arrested by the Manatee County Sheriff's Office ("MCSO") and detained as a pretrial detainee in the Manatee County Jail (hereinafter referred to as the "Jail").

Defendant Armor Correctional Health Services, Inc. contracted with Manatee County and MCSO to provide medical and mental health care to those detained and/or incarcerated at the Jail. Armor's services included performing intake, medical screening, assessing detainees for medical issues, and providing medical treatment, medical intervention, and referral services to those detained at the Jail.

During intake, on or about August 10, 2017, Hanna answered "No" to the question, "Do you have any mental, physical, or developmental disabilities or limitations that we need to know about during your incarceration?" (Dkt. 40 at ¶84). On his Intake

Health Screening, his appearance was noted as unremarkable; he did not have any visible signs of injuries and his behavior was alert and oriented. Hanna indicated that he was not currently ill or injured, he had not experienced a head injury in the last seventy-two hours, and he had not been to a hospital within the past three months. Hanna indicated that he had active asthma and used his inhaler in 2016. From the time of his booking, through August 22, 2017, Hanna presented and appeared to be a well-nourished, healthy, 29-year-old male.

On or about August 23, 2017, at approximately 11:58 a.m., Deputy Thomas McGuire, who was assigned to the Jail, received a phone call informing him that Hanna had passed out on the exercise yard. McGuire went to the exercise yard and asked Hanna what happened. Hanna said he was playing basketball, blacked out, and his head hurt. Hanna appeared disoriented at that time. Medical staff were called and Defendant Leila Polanco, a nurse and Armor employee, responded. When Polanco arrived, Hanna was seated in a chair. She was told by other residents of the Jail that Hanna had a seizure, it was too hot outside, and another resident may have hit Hanna on the head. She took Hanna's vital signs: his pulse was 90 and his blood pressure was 98/80.

Hanna was conscious and able to verbally communicate. He told Polanco that he had a right-sided headache and his pain was 7 on a scale of 1-10. Polanco concluded that the warm temperature outside caused Hanna to faint and that he may have hit his head during the fall and sustained a concussion. On the Urgent Care Assessment form she did not select the box associated with "Acute Medical Condition (e.g. loss of consciousness, seizure, etc.)." Instead, she selected the category "Unintentional (e.g. sports, fall, etc.)."

Polanco requested to view any available video surveillance of Hanna's incident in the exercise yard. Deputy McGuire notified Defendant Sergeant Ronald Laughlin and informed him of Hanna's incident, Polanco's observations and evaluations, and her desire to view any available video. Sgt. Laughlin permitted Polanco to view a color video recording of the incident on a computer. There was no audio. Sgt. Laughlin watched it too. The video showed Hanna and other residents playing basketball outside in the exercise yard when, all of a sudden, Hanna collapsed and hit his head on the ground. Sgt. Laughlin's notes from viewing the video indicated that at 11:55:19 Hanna collapsed and he remained on the ground until 11:56:00—a duration of 41 seconds.

At no point on August 23, 2017, did Nurse Polanco or Sgt. Laughlin request, contact, initiate, or recommend emergency medical services or fire rescue to respond to the Jail to evaluate Hanna. They also did not request that Hanna be evaluated by a licensed physician or medical doctor employed by Armor within the Jail. They never requested or recommended that Hanna be transported to an outside medical facility, like a hospital or emergency room.

Hanna was not seen by any physician, physician's assistant, or medical doctor on August 23, 2017. He was ordered to return to housing, where he resided in a cell alone.

On or about September 8, 2017, Deputy Randy Geis of MCSO observed Hanna on the floor of his cell. Deputy Geis asked if he was okay and Hanna stood up and told Deputy Geis that he felt light headed. Then, Hanna fainted. When Hanna fell, he hit his head on a wall within the cell. Deputy Geis called a "med stat" over the radio and Defendant Nurse Carma Ogline and Defendant Nurse Bernard Montayre, both Armor

employees, responded, along with a number of MCSO Deputies and Sergeants. Nurse Montayre attempted to take Hanna's blood pressure, but could not get a reading. Nurse Ogline took it using a manual cuff and stethoscope. No other vital signs were obtained or attempted to be obtained by them.

Nurse Ogline questioned Hanna to determine what happened. Hanna complained of left finger pain and told her he "passed out, I think." *Id.* at ¶113. Hanna was transported to the infirmary unit within the Jail where he was ordered to be monitored for two hours and then returned to his cell if he became stable. During those two hours in the infirmary unit, Hanna was never seen or evaluated by a doctor, physician, or physician's assistant.

At no point on September 8, 2017, did Nurse Montayre or Nurse Ogline request, contact, initiate, or recommend emergency medical services or request fire rescue to respond to the Jail to evaluate Hanna. They also did not recommend or request that Hanna be transported to an outside medical facility. Further, they did not request that an Armor physician or doctor see Hanna.

At no time on September 8, 2017, did any Armor employee perform any diagnostic, radiological, or other study of Hanna's heart, pulmonary, or neurological systems. Later that same day, Hanna was permitted to return to his cell without any required follow-up or observation of his medical condition.

The next day, Deputy Michael Braune of MCSO was assigned to the area of the Jail where Hanna was housed. At approximately 5:28 a.m., Deputy Braune passed Hanna's cell and observed Hanna lying face up on the floor underneath the toilet. He

entered the cell to check on Hanna, who was breathing, but unresponsive to verbal or tactile stimulation. Deputy Braune called a "med stat" and Nurse Ogline and Nurse Grether responded. Nurse Ogline recorded a blood pressure of 80/62 and an unreadable oxygen level. She observed that Hanna moaned at times, his hands were cold, his respirations were deep and course (almost snore-like), and his pupils were fixed.

Sgt. Carr of MCSO had master control activate emergency medical services, which arrived at approximately 5:58 a.m., and North River Fire Rescue arrived at approximately 6:10 a.m. In the meantime, Deputies from the MCSO attempted to perform CPR on Hanna. Hanna, EMS, and North River Fire Rescue exited the Jail at approximately 6:28 a.m. and Hanna was transported to a nearby hospital. Hanna has not regained consciousness and remains in a persistent vegetative state.

The amended complaint avers that at some time after September 9, 2017, Hanna returned to the Jail, where he was cared for at the Jail's infirmary, despite his persistent vegetative state. The allegations state that Hanna should have been transferred to an outside facility, such as a nursing facility, for total care and housing, but never was because the County, MCSO, and Armor wanted to save money.

The 134-page amended complaint delineates in great detail Armor's policies. It also avers in great detail prior Armor "incidents" involving poor medical care due to Armor focusing on cost savings, rather than the administration of proper medical care. For example, paragraphs 192-209 outline a parade of terribles—example after example of prior incidents—most of which resulted in the death of the prisoner/detainee because the medical care they received was grossly inadequate. The amended complaint includes that

the County and MCSO knew or should have known of the described incidents, especially in light of their contractual relationship with Armor, which began in 2012. The amended complaint describes in painstaking detail (*see* paragraphs 16-29) factual allegations related to the Jail's overpopulation, failure to employ adequate staffing, and deficiencies related to adequate medical care. Related to these allegations, there are facts imputing the County, MCSO, and Armor with knowledge of these problems.

The crux of the amended complaint is that Defendants were medically negligent and deliberately indifferent to Hanna's medical needs. Related to this, there are a number of negligent hiring and supervision claims against certain Defendants, and negligence claims related to the overcrowding of the Jail.

In sum, the amended complaint names nine Defendants—Rick Wells, in his official capacity as the Sheriff of Manatee County, Sgt. Laughlin, Armor, several Armor nurses and one Armor physician, and Manatee County—includes twenty-three legal claims (Counts I-XXIII), and contains 792 paragraphs. Rather than list each count, the Court will discuss the legal claim during its analysis of Defendants' motions to dismiss.

Because it is clear on the face of the amended complaint that most of the claims are properly pled and provide Defendants with ample notice of the facts supporting each claim, the Court will begin with an analysis of the federal claims and then will briefly discuss why the majority of the state law claims survive at this juncture.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint when it fails to state a claim upon which relief can be granted. When reviewing a motion

to dismiss, a court must accept all factual allegations contained in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation omitted). It must also construe those factual allegations in the light most favorable to the plaintiff. *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (internal citation omitted).

To withstand a motion to dismiss, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Pleadings that offer only "labels and conclusions," or a "formulaic recitation of the elements of a cause of action," will not do. *Twombly,* 550 U.S. at 555.

## DISCUSSION

## I. Federal Section 1983 Claims for Deliberate Indifference to Medical Needs

### A. The Elements of the Claim

"'[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain,' which is prohibited by the Eighth Amendment." *Harris v. Leder*, 519 Fed. Appx. 590, 595 (11th Cir. May 24, 2013) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). Not every claim of inadequate medical attention rises to the level of a constitutional violation. To show that a prison official acted with deliberate indifference to serious medical needs, a prisoner must establish three elements. First, he must satisfy the objective component by showing that he had a serious medical need. Second, he must satisfy the subjective

component by showing that a prison official acted with deliberate indifference. Third, as with any tort claim, the prisoner must show that the injury was caused by the defendant's wrongful conduct. *See Goebert v. Lee Cnty.*, 510 F.3d 1312 (11th Cir. 2007).

To establish the subjective component, a prisoner must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence. *See Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir. 2005); *Taylor v. Adams,* 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

A delay in providing medical treatment can sustain a "deliberate indifference" claim, where the delay has exacerbated the prisoner's injury or unnecessarily prolonged the inmate's pain. *See Harper v Lawrence Cnty., Ala.,* 592 F.3d 1227, 1235 (11th Cir. 2010). In this type of case, the nature of the medical need, the reason for the delay, and the effect of the delay on the prisoner's medical condition are all relevant factors in determining whether the delay has reached constitutionally intolerable proportions. *See Goebert,* 510 F.3d at 1327. When the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference. *See Ancata*, 769 F.2d at 704.

## B. Municipal and Supervisor Liability under Section 1983

Any plaintiff bringing a section 1983 claim against a municipality based on the acts of one of its employees/agents must prove two things. First, the plaintiff must sufficiently allege a constitutional violation. *See City of Los Angeles v. Heller,* 475 U.S.

796, 799 (1986).  Second, the "plaintiff suing a municipality under § 1983 must show that the municipality itself injured the plaintiff by having in place a policy or custom which violated the plaintiff's rights."  *Buckner v. Toro,* 116 F.3d 450, 451 (11th Cir. 1997) (citing *Monell v. Dept. of Social Servs. of New York,* 436 U.S. 658 (1978)).  Under *Monell,* the municipal "policy" or "custom" must be the moving force behind the constitutional violation and "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.'"  *City of Canton, Ohio v. Harris,* 489 U.S. 378, 379 (1989).

Here, although Armor is a private entity, it is considered a municipality for purposes of section 1983 liability because the County and MCSO contracted with Armor to provide medical care within the Manatee County jail system.  In other words, Armor performed traditional public functions.  *See Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 181-82 (11th Cir. Sep. 6, 2012) (noting that: "Although Prison Health is not a governmental entity, '[w]here a function which is traditionally the exclusive prerogative of the state (or here, county) is performed by a private entity,' that private entity, like a municipality, may be held liable under § 1983") (quoting *Ancata,* 769 F.2d at 703).

Finally, supervisory personnel cannot be held liable under section 1983 for the actions of their subordinates under a theory of respondeat superior.  *See Monell*, 436 U.S. at 691; *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir. 1990).  In order to impose liability on a supervisor, Plaintiff must allege that the supervisor either personally participated in the acts comprising the alleged constitutional violation or instigated or adopted a policy that violated Whidden's constitutional rights.  See *Adams v. Poag*, 61 F.3d 1537, 1544

(11th Cir. 1995).

With respect to a failure to train, "a plaintiff alleging a constitutional violation premised on a failure to train must demonstrate that the supervisor had 'actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights,' and that armed with that knowledge the supervisor chose to retain that training program." *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1052 (11th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

Having explained the legal standards, the Court turns to Defendants' motions to dismiss. The Court begins with a discussion of the claims asserted against the individual Defendants. The Court will then turn to the municipal and supervisor claims asserted against Armor, MCSO, and Manatee County.

### C. The Individual Defendants

Upon careful review of the amended complaint, the Court concludes that all of the claims are sufficiently pled against the individual Defendants, except for Defendants Paula Sanders and Elvira Perez. So the deliberate indifference claims against Polanco, Ogline, Montayre, and Sgt. Laughlin will not be dismissed.[1] As Plaintiff points out in his responses, these individuals were all placed on notice of Hanna's syncopal episodes but took no action. The amended complaint alleges their (1) subjective knowledge of a risk

---

[1] The facts discussed in this section are also sufficient to state medical negligence claims against Polanco, Ogline, and Montayre. So Armor's motion to dismiss is also denied with respect to these claims. With respect to Sgt. Laughlin, the allegations related to his participation are also sufficient to state a claim of vicarious liability for his negligence. So MCSO's motion is denied with respect to that claim.

of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence. Notably, none of these Defendants ever requested that a physician located in the Jail evaluate Hanna.

Plaintiff directs the Court to another deliberate indifference case, involving Armor, which is persuasive. In *Davies v. Israel*, the court denied all of the defendants' motions to dismiss. 342 F. Supp. 3d 1302 (S.D. Fla. 2018). In denying the motions to dismiss, the court noted: "Plaintiff alleges that each Defendant played a different role in tending to Plaintiff when he was unconscious and bleeding but nonetheless disregarded that serious risk by failing to facilitate Plaintiff's immediate emergency transfer to a hospital by, for example, calling 911. In this way, Defendants each participated in delaying necessary treatment for no apparent medical reason, which may constitute deliberate indifference." *Id.* at 1308 (citing *Rutledge v. Ala.*, 724 F. App'x 713, 735 (11th Cir. 2018), *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).

Similarly, Defendants Polanco, Ogline, Montayre, and Sgt. Laughlin ignored Hanna's obvious need for (at the very least) a doctor's evaluation. At intake, he was a healthy, 29-year-old male. He suddenly passed out while playing basketball, hit his head, remained passed out for 41 seconds, and appeared disoriented upon waking. He was ordered to return to his housing, where he resided alone. Hanna was never seen or evaluated by a licensed medical doctor, physician, or physician's assistant. Follow-up care was not required or recommended.

Hanna then passed out two more times. During the two hours that he stayed in the Jail's infirmary unit, he was never seen or evaluated by a doctor, physician, or physician's

assistant. Testing was not performed. Emergency Medical Services ("EMS") was not requested. Hanna was sent to his cell and no follow-up, or supplemental observation was required.

It was not until after Hanna's fourth syncopal episode that EMS was called. By that time, Hanna had lost consciousness and remains in a persistent vegetative state. These facts plausibly show a need for medical treatment that was obvious and medical care that was so cursory as to amount to no treatment at all.

Notably, only Defendant Sgt. Laughlin argues that he is entitled to qualified immunity (assuming a constitutional violation occurred). This argument is denied at this stage. The Eleventh Circuit has held that it is "clearly established … that an official acts with deliberate indifference when he intentionally delays providing … access to medical treatment, knowing that the [arrestee] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Valderrama v. Rousseau*, 780 F.3d 1108, 1121 (11th Cir. 2015) (quoting *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)). The allegations as to Sgt. Laughlin plead that he was on notice that Hanna had an urgent medical condition that escalated to being in a persistent vegetative state because Sgt. Laughlin took no steps to activate EMS after Hanna had been passed out for 41 seconds and appeared disoriented. Sgt. Laughlin may reargue his entitlement to qualified immunity at the summary judgment stage once the record is further developed.

The Court concludes that the claims against Sanders and Perez must be dismissed. Indeed, the first 211 paragraphs of the amended complaint, which are the common

allegations, do not even reference Sanders and Perez. They are not referenced until much later in the amended complaint where Plaintiff broadly alleges that Sanders and Perez were deliberately indifferent to Hanna's medical needs. But it is completely unclear what role, if any, they played. Accordingly, Armor's motion will be granted with respect to Sanders and Perez.[2]

### D. Municipal and Supervisor Claims

<u>Armor</u>

The deliberate indifference claims against Armor are adequately pled. Contrary to Armor's arguments, the amended complaint provides numerous examples of Armor's custom and policy of habitually delaying taking inmates, who require emergency medical care, to the hospital for treatment, thus causing serious injury and death. Plaintiff then alleges facts about Armor's decision to return and keep Hanna in the Jail once he was finally hospitalized, knowing that it was inadequately staffed and without necessary equipment to treat his serious medical condition of being in a persistent vegetative state. Accordingly, Armor's motion is denied with respect to the deliberate indifference claims.

<u>MCSO</u>

The deliberate indifference claim against MCSO is adequately pled. The amended complaint alleges that Sheriff Wells and MCSO had a policy or custom to allow overcrowding of the Jail, particularly the infirmary/medical unit. It was this "policy" or "custom" that was a moving force behind the constitutional violation. Plaintiff also avers that MCSO habitually failed (i.e., had a custom of failing) to supervise and evaluate

_____

[2] For these same reasons, the medical negligence claim against Sanders will be dismissed.

Armor's performance under the contract to provide health care services in the Jail, despite having actual or constructive knowledge of Armor's widespread and longstanding practices of violating pretrial detainees' constitutional rights. MCSO neglected to ensure that Armor complied with its contractual obligations about its performance under the contract, like the requirement to timely provide emergency, ambulatory, or specialty care. At this motion to dismiss stage, these allegations are sufficient to plead MCSO's liability.

Manatee County

The deliberate indifference claim against Manatee County is adequately pled. Plaintiff has alleged that the County's decisionmakers (i.e., its Board of County Commissioners) consistently knew that the Jail and its infirmary were overcrowded and made comments that foreshadowed that these issues would likely cause problems in the future. According to the amended complaint, the County was on actual notice that Sheriff Wells thought the Jail was "understaffed," *id.* at ¶¶24, 29, lacked updated technology, such as electronic medical records, *id.* at ¶27, and felt as though Armor was both under staffing and having difficulty recruiting adequate talent for positions, *id.* at ¶ 29.

Despite contracting the services of Armor to provide medical care to people like Hanna in the Jail, the Board repeatedly (over a span of years) complained and expressed negative feelings about the actual cost of providing care to pretrial detainees in the Jail. The Board also specifically discussed the medical needs of Hanna—care at an outside nursing facility in contrast to the cost of actually providing those services in the Jail—and made a conscious choice not to provide outside care because it was too expensive.

Plaintiff also alleges that the County was concerned with getting: "the best bang for [its] buck." *Id.* at ¶77. The County referred to a small class of detainees that included Hanna as making up "the bulk of the problem," and expressed financial concerns related to the cost associated with a need for emergency transport to outside services. *Id.* at ¶79.

According to the amended complaint, at all material times, Hanna should have been transported to an outside facility and the County was deliberately indifferent to this medical need because the County wanted to save money. *Id.* at ¶83. Plaintiff alleges that it was the County's refusal to take action due to cost-saving concerns that caused a violation of Hanna's constitutional rights to receive adequate medical care. This was part of a longstanding and widespread practice and custom. *Id.* at ¶¶458-484.

In sum, Manatee County's motion to dismiss with respect to the deliberate indifference claim will be denied because Plaintiff alleges Manatee County itself injured Hanna by having in place a policy or custom that violated Hanna's constitutional rights.

## II. Related Florida Claims

### A. Armor

The Court concludes that the following negligence claims against Armor are adequately pled: Count I - negligent hiring of Nurse Polanco; Count II - negligent training & supervision; and Count IV vicarious liability for employees' medical negligence.

The amended complaint includes factual details related to Armor failing to reasonably investigate Polanco before it hired her. Polanco had been previously terminated from a similar position by Corizon Correctional Healthcare, the company that handled health services for the Jail, immediately prior to Armor's contract with MCSO

and Manatee County. Polanco was unfit for the job and Hanna was within the zone of foreseeable risk created by her employment because she failed to correctly diagnose his medical condition on or about August 23, 2017, and failed to render (or recommend) adequate care.

The negligent training and supervision claim delineates in great detail Armor's policies regarding Armor's duty to train and supervise its employees and outlines how these policies were violated. *Id.* at ¶235. This claim also alleges that it was this failure to adequately train and supervise that caused Hanna's serious medical condition.

With respect to the vicarious liability for employees' medical negligence claim, the Court will permit Plaintiff to plead this claim in the alternative. Specifically, the claims of negligent hiring and negligent training and supervision purport to bring direct negligence claims against Armor. To the extent that these claims relate to the Armor employees' employment, i.e., actions that took place during the course and scope of their employment, there is no need to also allege a vicarious liability claim because the claims will become duplicative. Since Rule 8 permits alternative pleading, the Court will not further address Armor's argument that the claims are "duplicative" and "unnecessary."

The Court grants Armor's motion with respect to the negligent overcrowding of the Jail claim. As Armor points out, it has no ability (and, as such, no duty) to change the size of the Jail, change the size of the infirmary, or unilaterally propose county construction projects to make more space. Also, the Court notes that, to the extent this claim relates to Armor's employees' failure to adequately operate the Jail infirmary, any such claim would be subsumed in the claim for negligent training and supervision. So the

negligent overcrowding claim will be dismissed.

**B.     MCSO**

MCSO moves to dismiss all of the Florida tort claims: negligent hiring, supervision, and retention of Armor; negligent retention of MCSO employees; negligent overcrowding of jail; and vicarious liability for Sgt. Laughlin's negligence.[3]  Upon review of these claims, the Court concludes they are adequately pled, except for the claim of negligent retention of MCSO employees.

As explained above in the context of the deliberate indifference claim against MCSO, Plaintiff avers that MCSO habitually failed (i.e., had a custom of failing) to supervise and evaluate Armor's performance under the contract to provide health care services in the Jail, despite having actual or constructive knowledge of Armor's widespread and longstanding practices of violating pretrial detainees' constitutional rights.  MCSO neglected to ensure that Armor complied with its contractual obligations about its performance under the contract, like the requirement to timely provide emergency, ambulatory, or specialty care.  MCSO's failure to adequately supervise Armor damaged Hanna.  These allegations are sufficient.

The claim related to negligent retention of MCSO employees does not sufficiently plead causation, i.e., that any negligence on the part of MCSO's employees was the proximate cause of Hanna's harm.  Indeed, there are no facts alleging that any MCSO employee, other than Sgt. Laughlin, came into sufficient contact with Hanna to have

_____
[3] As stated above, the vicarious liability claim related to Sgt. Laughlin's negligence will not be dismissed.

caused him any injury. So this claim will be dismissed.

Finally, the negligent overcrowding of the Jail claim will not be dismissed. Plaintiff avers that from 2015-2018, the average daily jail population at the Jail exceeded its limits and the Jail was understaffed. The Sheriff knew that the Jail's infirmary unit was only built for 24 people but was "often over the capacity." *Id.* at ¶26. Notably, contrary to MCSO's motion, Plaintiff's claim is not that MCSO should build or expand the Jail. Rather, Plaintiff claims that, in operating the Jail day-to-day, the Sheriff continually allowed overcrowding, which in turn led to overcrowding within the Jail's infirmary unit, which ultimately impacted the medical care that Hanna received at various points in his detention. The overcrowding caused and contributed to Hanna's inadequate evaluations and treatments, both during the syncopal episodes, and after he was already in a vegetative state.

As Plaintiff argues in the response, the inquiry is whether, in the operation of the Jail with its known limitations and overcrowding, MCSO failed to reasonably send Hanna to an outside facility, instead of leaving him in an overcrowded, understaffed, and ill-equipped infirmary unit. Plaintiff is not claiming that the Jail or its infirmary/medical unit should have, from inception, been designed, planned, or constructed for a larger capacity. As the Florida Supreme Court has noted, how a Sheriff assigns detainees in his or her custody to particular locations "is an operational level act not protected by sovereign immunity." *Dept. of Health & Rehab. Servs. v. Whaley*, 574 So. 2d 100, 104 (Fla. 1991); accord *Stiles v. Judd*, No. 8:12-cv-2375-T-27EAJ, 2013 WL 4714402, at *10 (M.D. Fla. Aug. 30, 2013). Accordingly, the Court will not dismiss this claim.

### C. Manatee County

The only Florida claim against Manatee County is a claim for negligent hiring, retention, and supervision of Armor. This claim is very similar to the claim discussed in the previous section against MCSO. At this stage, the Court will permit this claim to survive because the amended complaint alleges that Manatee County was on notice that Armor was incompetent and unfit to perform medical services at the Jail and Manatee County elected to take no action with respect to Armor because Manatee County was more concerned with saving costs. These facts are discussed in more detail under the deliberate indifference claim asserted against Manatee County.

The negligence claim also alleges causation, i.e., that Manatee County's failure to adequately supervise Armor led to Hanna's damages. Accordingly, the Court will not dismiss this claim.

Having addressed all of the legal claims, the Court parts with one final thought. Defendants asserted some arguments that were not appropriate at this motion to dismiss stage. The Court's failure to address them does not mean they lack merit. Rather, for the sake of brevity in light of the twenty-three claims that were at issue here, the Court declined to address certain arguments that are best left for summary judgment.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant Rick Wells' Motion to Dismiss (Dkt. 43) is granted in part and denied in part.

2. Defendant Ronald Laughlin's Motion to Dismiss (Dkt. 44) is denied.

3. Armor Defendants' Joint Motion to Dismiss (Dkt. 45) is granted in part and

denied in part.

4.      Defendant Manatee County's Motion to Dismiss (Dkt. 48) is denied.

5.      All legal claims will remain except for the following: Counts VI, IX, XVIII, XIX, and XX.

6.      Defendants shall file their Answers to the Amended Complaint within fourteen (14) days of this Order.

**DONE** and **ORDERED** in Tampa, Florida on June 28, 2019.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record